# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

INTERNATIONAL MEZZO TECHNOLOGIES, INC.

**VERSUS**                                    **CIVIL ACTION NO. 10-397-SCR**

**FRONTLINE AEROSPACE, INC. and**

**RYAN WOOD**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY INTERNATIONAL MEZZO TECHNOLOGIES, INC.

**NOW INTO COURT**, through undersigned counsel, comes International Mezzo Technologies, Inc., which submits its post trial findings of fact and conclusions of law.

In its complaint Mezzo alleges Frontline and Ryan Wood (1) misappropriated trade secrets, (2) breached contracts, (3) wrongly claimed, under oath, that Wood was the inventor of Mezzo's recuperator when it is clear that Kelly invented the annular shaped, corrugated wall microtube recuperator, (4) committed fraud, (5) misappropriated patent rights, and (6) otherwise damaged Mezzo. Mezzo seeks an injunction, damages, attorney's fees, listing Kelly as the inventor of the '031 patent, and assignment of the '031 patent to Mezzo as owner.

Mezzo's post–trial submission for each claim follows the following format. It first presents the claim or cause of action, the law on that cause of action and then provides the supporting facts. Some of the conclusions of law and explanations are in paragraph format, while others are single sentences. The references are to Plaintiff's exhibits or Defendants'

exhibits. The testimony, which covered three days, is referenced by witness name and transcript page number.

## I. FRONTLINE AND WOOD VIOLATED THE LOUISIANA TRADE SECRETS ACT[1] WHEN THEY MISAPPROPRIATED MEZZO'S PROPRIETARY AND CONFIDENTIAL TRADE SECRETS, DISCLOSED THEM TO THIRD PARTIES WITHOUT PERMISSION, AND MISAPPROPRIATED THEM FOR THEIR OWN USE.

A trade secret is information, including a formula, pattern, compilation, program, device, method, technique, or process that: derives independent economic value, actual or potential, from not being known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and is subject of efforts that are reasonable under the circumstances to maintain its secrecy.[2]

To establish a claim for theft of trade secrets Mezzo must prove: (1) that Mezzo's recuperator design or the foundations of the design were trade secrets; (2) that Mezzo took reasonable steps to protect the confidentiality of its trade secrets; (3) that Wood and Frontline misappropriated the recuperator design and other trade secrets; and (4) that Wood and/or Frontline disclosed the recuperator design or other trade secrets without authority.[3]

Once Mezzo has established these four elements it is entitled to: (1) an injunction against future disclosure by Wood or Frontline; (2) monetary damages; and (3) attorney's fees.

A. Mezzo's Corrugated Wall Microtube Recuperator In An Annular Shape Was A Trade Secret At The Time It Was Disclosed To Ryan Wood.[4] Further, The Information Used To Design The Recuperator Was And Still Is Mezzo's Trade Secret.

---

[1] La. R.S. 51: 1431 *et seq.*
[2] La. R.S. 51: 1431.
[3] *Tubos v. Acero de Mexico, S.A. v. American International Corp., Inc.,* 292 F.3d 579 (5th Cir. 2002).
[4] *Tubos v. Acero de Mexico, S.A. v. American International Corp., Inc.,* 292 F.3d 579 (5th Cir. 2002).

1. In 2006, Mezzo started developing microtube designs for recuperators and heat exchangers. (Testimony of Kevin Kelly at p. 32).

2. In 2007, Mezzo designed a heat exchanger containing 15,000 microtubes. (Testimony of Kevin Kelly at p. 32).

3. The method of assembly and construction were a Mezzo owned proprietary trade secret technique. Each heat exchanger (recuperator) could be assembled in about an hour. (Testimony of Kevin Kelly at p. 32).

4. Mezzo employees[5] invented a flat recuperator using a configuration of corrugated microtubes. The ownership of the patent for a flat recuperator using a corrugated bank of microtubes was assigned to Mezzo in writing. (Plaintiff's Exhibit 67).

5. In inventing the flat recuperator using a corrugated wall of microtubes, the Mezzo employees used an extensive and very accurate wind tunnel and tested numerous microtube geometries to determine the capabilities of each. (Testimony of Kevin Kelly at p. 46).

6. Mezzo using the wind tunnel data came up with correlations for different geometries which are trade secrets and are the basis of Mezzo's recuperator designs. (Testimony of Kevin Kelly at p. 46).

7. Mezzo has a number of proprietary geometries for microtube recuperators that no one else uses. (Testimony of Kevin Kelly at p. 46).

8. Kelly, in the course and scope of his employment used Mezzo's intellectual property of a corrugated wall of microtubes and invented a

---

[5] Becnel and McLean.

new configuration by arranging them in an annular shape. (Testimony of Kevin Kelly at p. 34).

B.   Mezzo's Corrugated Wall Microtube Recuperator In An Annular Configuration Was Not Known.

1.   Kelly, in the course and scope of his employment with Mezzo, consulted the Mezzo correlations, databases, and experiment results to decide that the corrugated bank of microtubes would be best for the recuperator at issue in this case. (Testimony of Kevin Kelly at pp. 48-50).

2.   An international patent search firm indicated that Mezzo's concept for corrugated wall microtube recuperators was unique, not disclosed by the prior art, and internationally patentable. (Testimony of Kevin Kelly at pp. 83-84; Plaintiff's Exhibit 1). Consequently, until the corrugated wall microtube in an annular arrangement was disclosed to the public, it was not known and was a Mezzo trade secret.

3.   Dr. Kandlikar, Frontline's expert, testified that in his search of the open literature, the only place that identifies an annular, corrugated microtube heat exchanger is the Mezzo design report. (Testimony of Kandlikar at pp. 538-539). Consequently, the design was not known and had not been disclosed prior to Wood and Frontline disclosing it. The corrugated wall microtube recuperator in an annular arrangement was a Mezzo trade secret.

4.   Wood stated in an e-mail [dated Oct 6, 2008] that he considered the serpentine corrugated wall design "the brain design" to be proprietary to

Mezzo; yet this is the same diagram he used in the patent application submitted in May 2008. (Plaintiff's Exhibit 44).

5.    Wood stated that he had never seen a design like Mezzo's annular configured corrugated wall bank of microtubes before. (Testimony of Ryan Wood at p. 254).

6.    Wood stated that the corrugated design was novel, and therefore not known. (Testimony of Ryan Wood at p. 257).

C.    <u>Mezzo's Recuperator Has Independent Economic Value, Both Actual And Potential</u>.

1.    The concept of a corrugated microtube heat exchanger has economic value as the cost of the radiator for an Indy racing league car is $7,500 for Formula 1 cars it will be $20,000. (Testimony of Kevin Kelly at pp. 34-36).

2.    The estimated market for the Mezzo corrugated microtube recuperator in an annular configuration is between $510 million and 1 billion dollars.

3.    Mezzo's process to design and develop the recuperator has independent economic value because no one else can build microtube recuperators as efficiently as Mezzo. (Testimony of Kevin Kelly at pp. 32-33).

D.    <u>Mezzo Took Reasonable Efforts To Protect Its Trade Secrets</u>.

1.    In January 2008, Wood and Frontline orally agreed with Mezzo to keep any Mezzo information sent to them confidential. (Testimony of Kevin Kelly at pp. 49-60).

2.    Wood signed and forwarded to Mezzo a written Non-Disclosure Agreement at least three times. (Plaintiff's Exhibits 3, 4, 5, 6, 19, 38, and 45).

3.    Kelly forwarded an Non-Disclosure Agreement to Wood in January 2008 and indicated that the Non-Disclosure Agreement must be signed before Mezzo information would be shared with Wood or Frontline (Testimony of Kevin Kelly at p. 56; Plaintiff's Exhibit 7).

4.    Wood executed and returned the Non-Disclosure Agreement via e- mail and via fax. (Plaintiff's Exhibit 4 and 5; Testimony of Kevin Kelly at pp. 56-58; Testimony of Ryan Wood at p. 222).

5.    Wood testified that the Agreement was effective January 10, 2008. (Testimony of Ryan Wood at pp. 223-224).

6.    The February 3, 2008 Design Report was transmitted to Frontline and Wood after Wood signed and returned the Non-Disclosure Agreement (Plaintiff's Exhibits 12 and 13).

7.    Kelly indicated to Wood that everything was confidential in March 2008. (Testimony of Kevin Kelly at p. 75; Testimony of Ryan Wood at p. 254).

8.    The April 2008 quotation was transmitted to Frontline and Wood after Wood signed and returned the Non-Disclosure Agreement. (Plaintiff's Exhibits 12 and 13).

9.    It was Kelly's understanding that Wood agreed to the terms of the Non-Disclosure Agreement. (Testimony of Kevin Kelly at p. 59).

10.     It was Kelly's understanding that Wood was not going to disclose Mezzo's information. (Testimony of Kevin Kelly at p.59).

11.     Wood expressly acknowledged that the Non-Disclosure Agreement was binding and agreed to comply with the terms of the Non-Disclosure Agreement when he terminated it. (Plaintiff's Exhibits 45 and 50; Testimony of Kevin Kelly at pp. at 80-81; Testimony of Ryan Wood at p. 238).

12.     Wood forwarded a signed copy of the Non-Disclosure Agreement to Mezzo in October 2008, and indicated that it was the agreement between the parties. (Testimony of Kevin Kelly at p. at 77; Plaintiff's Exhibit 45).

13.     Wood terminated the Non-Disclosure Agreement because he thought it was effective. (Testimony of Ryan Wood at p. 230).

14.     Wood closes his November 14, 2008 letter at "we will continue to comply with the terms of the now terminated agreement." (The Non-Disclosure Agreement). (Plaintiff's Exhibit 50).

15.     The express terms of the Non-Disclosure Agreement required the recipient of confidential information (here Wood and Frontline) to keep the sender's (Mezzo's) information confidential. (Testimony of Ryan Wood at pp. 225-230).

16.     The Non-Disclosure Agreement indicates that confidential information does not need to be marked confidential. (Testimony of Ryan Wood at p. 225; Plaintiff's Exhibits 3 and 4).

17.  Confidential information includes Mezzo's drawings and designs. (Testimony of Ryan Wood at pp. 225-28; Plaintiff's Exhibits 3 and 4).

18.  Mezzo prepared a design report on February 4 and marked it proprietary and confidential (Testimony of Kevin Kelly at pp. 98-99; Plaintiff's Exhibit 26).

19.  Mezzo employees sign confidentiality and non-compete agreements to keep Mezzo's information secret. (Testimony of Kevin Kelly at p. 49; Plaintiff's Exhibit 54).

E.  Wood And Frontline Had An Obligation To Maintain The Confidentiality Of Mezzo's Trade Secrets, Because They Agreed To Keep Them Secret And Because They Entered Into A Non-Disclosure Agreement.

C.C. art 1927 provides that offer and acceptance can be "made orally, in writing, **or by action or inaction that under the circumstances is clearly indicative of consent.**"[6] Further, unless specified in the offer, there is no need for conformity "between the manner in which the offer is made and the manner in which it is accepted."[7] Here, there was a signed written agreement effective January 10, 2008. In addition, Mezzo performed by divulging its intellectual property thinking it was operating under cloak of protection brought by the Non-Disclosure Agreement; thus, it clearly had agreed to enter into the Non-Disclosure Agreement. Finally, contracts must be performed in good faith.

1.  In January 2008, Mezzo and Frontline entered into an oral Non-Disclosure Agreement when Kelly told Wood that Kelly would send Mezzo's

---

[6] C.C. art. 1927 states:
   A contract is formed by the consent of the parties established through offer and acceptance.
   Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
   Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

[7] C.C. art. 1927.

confidential information once Wood signed the NDA. (Testimony of Kevin Kelly at pp. 49-60).

2.    There was a written Non-Disclosure Agreement between Frontline and Mezzo.

    (a)    Wood signed and forwarded to Mezzo a written Non-Disclosure Agreement at least three times. (Plaintiff's Exhibits 3, 4, 5, 6, 19, 38 and 45).

    (b)    Kelly forwarded a Non-Disclosure Agreement to Wood in January 2008 and indicated that the Non-Disclosure Agreement must be signed before information will be shared with Wood or Frontline (Testimony of Kelly at p. 56; Plaintiff's exhibit 7).

    (c)    Understanding that Mezzo's confidential trade secrets and intellectual property must be protected prior to engaging in this type of work, Kelly emailed Wood a Non-Disclosure Agreement. (Exhibit 7; Testimony of Kevin Kelly at pp. 56-57).

    (d)    Wood executed and returned the Non-Disclosure Agreement via e-mail and via fax. (Plaintiff's Exhibit 8; Testimony of Kelly at pp. 56-58; Testimony of Ryan Wood at p. 222).

    (e)    Wood testified that the Non-Disclosure Agreement was effective January 10, 2008. (Testimony of Ryan Wood at pp. 223-24).

    (f)    The Design Report and Quotation were transmitted to Frontline and Wood after January 10, 2008. (Plaintiff's Exhibits 12 and 13).

(g)     It was Kelly's understanding Wood agreed to the terms of the Non-Disclosure Agreement, and he was not going to disclose Mezzo's information. (Testimony of Kevin Kelly at p. 59).

(h)     Wood expressly acknowledged that the Non-Disclosure Agreement was binding and agreed to comply with the terms of the Non-Disclosure Agreement. (Plaintiff's Exhibit 50; Testimony of Kevin Kelly at pp. at 80-81; Testimony of Ryan Wood at p. 238).

(i)     Wood forwarded a signed copy of the Non-Disclosure Agreement to Mezzo in October 2008, and indicated that it was the agreement between the parties. (Testimony of Kevin Kelly at p. 77; Plaintiff's Exhibit 45).

(j)     Wood never asked for a copy of the Non-Disclosure Agreement signed in January 2008 by Kelly. (Testimony of Kevin Kelly at pp. 60; 73; Testimony of Ryan Wood at p. 238).

(k)     Kelly indicated to Wood that everything was confidential in March 2008. (Testimony of Kevin Kelly at p.75; Testimony of Ryan Wood at p. 254).

(l)     Wood placed his copy of the Non-Disclosure Agreement in the binder where he keeps all of his other enforceable Non-Disclosure Agreements, thereby demonstrating that Wood thought he had a binding agreement even without the signature of Kevin Kelly. (Testimony of Ryan Wood at p. 396).

(m)     Wood terminated the Non-Disclosure Agreement, thereby indicating that he thought there was a binding agreement even though he did not have a copy with Kevin Kelly's signature. (Testimony of Ryan Wood at p. 230).

(n)     Wood closes his November 14, 2008 letter at "we will continue to comply with the terms of the now terminated agreement." Plaintiff's Exhibit 50).

F.     <u>Wood And Frontline Converted Mezzo's Confidential Information To Their Own Use.</u>

1.     Wood's patent application copied the diagrams in the Mezzo design report. (Testimony of Kevin Kelly at pp. 109-110).

2.     Mezzo did not authorize Wood to use the diagrams in Wood's patent application. (Testimony of Kevin Kelly at p. 109; Testimony of Ryan Wood at p. 231).

3.     Wood copied the diagrams from the Quotation without authorization and used them in his patent application. (Testimony of Kevin Kelly at p. 109).

4.     Specifically, Wood acknowledged, that Figures 6 and 7, Figure 8, Figure 9, Figure 10A in the patent application were used without Mezzo's permission. Consequently, Wood's statement to the patent office, under the penalty of perjury, that he was the owner and inventor of these concepts is false. (Testimony of Kevin Kelly at pp. 116-117).

5.     Wood not only copied the diagrams he copied the concepts as well. (Testimony of Kevin Kelly at p. 117).

6. Moreover, Wood further acknowledged that Figure 11A is from Mezzo and is the "brain design" that Wood said he considered confidential and proprietary to Mezzo. Wood also admitted that Figures 11B and 11C were also Mezzo designed property Moreover, Wood clearly acknowledged, under oath, that it is the recuperator – Mezzo's recuperator that is the true novel portion of his claim 13. (Testimony of Ryan Wood at pp. 235-240).

7. Frontline's expert, Dr. Kandlikar, testified that the diagrams in the patent application were copied from Mezzo's Design Report. (Testimony of Dr. Kandlikar at p. 512).

G.     Wood And Frontline Breached Their Duty Of Confidentiality By Numerous Unauthorized Disclosures.

An invention held as a trade secret can become the subject of a U.S. patent application legitimately, when such application is filed by the actual inventor(s). In such case, the trade secret information regarding the invention and how to make and use it are revealed in the patent application in accordance with 35 U.S.C. § 112, and is made publicly available by the Patent Office when the application is published under 35 U.S.C. § 122, or at the latest, when the patent is issued. Once published or issued as a patent, the information disclosed in the patent application becomes public and is no longer secret, having in most cases a destructive effect upon the trade secret status of the information contained in the application.[8]

1.     Disclosure to the Patent Office and resulting publication

(a)     Wood submitted Mezzo's concepts and diagrams to the Patent Office in his patent application; thereby breaching his obligation to

---

[8] *Tewari De-ox Systems, Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611-612 (5th Cir. 2011).

keep the information confidential and to refrain from unauthorized use. (Defendants' Exhibit 59; Testimony of Ryan Wood at p. 261).

    (b)    Wood and Frontline did not have Mezzo's permission to disclose the information to the Patent Office. (Testimony of Ryan Wood at p. 262).

    (c)    Wood considered the brain design included in the Frontline patent application was confidential and proprietary to Mezzo. (Plaintiff's Exhibit 44).

    (d)    The Patent Office published the patent with Mezzo's confidential information. (Defendants' Exhibit 58).

2.    Wood and Frontline disclosed Mezzo's confidential and proprietary information to Geoff Campbell of Microvection, Inc.

    (a)    Frontline and Wood disclosed Mezzo's recuperator concept to Geoff Campbell of Microvection, Inc. (Testimony of Ryan Wood at p. 243; Plaintiffs' Exhibit 10).

    (b)    Mezzo did not give permission to Frontline and Wood to disclose the confidential and proprietary information to Geoff Campbell. (Testimony of Ryan Wood at p. 244).

3.    Wood and Frontline disclosed Mezzo's confidential and proprietary information to Mark Waters.

    (a)    Frontline and Wood disclosed Mezzo's recuperator concept to Mark Waters. (Testimony of Ryan Wood at p. 241; Plaintiff's Exhibits 21, 22 and 23).

      (b)      Mezzo did not give permission to Frontline and Wood to disclose the confidential and proprietary information to Mark Waters. (Testimony of Ryan Wood at p. 241).

4.      Frontline and Wood disclosed Mezzo's recuperator concept to Engineering TV without permission.

      (a)      Frontline and Wood disclosed Mezzo's recuperator concept to Engineering TV. (Plaintiff's Exhibit 44).

      (b)      Mezzo did not give permission to Frontline and Wood to disclose the confidential and proprietary information to Engineering TV. (Plaintiff's Exhibit 44).

5.      Frontline and Wood disclosed Mezzo's recuperator concept to potential investors without permission.

      (a)      Frontline and Wood disclosed Mezzo's recuperator concept to Third Coast Capital, Alliance Warburg Capital, Michael Calloway and the Phoenix group without Mezzo's permission. (Testimony of Ryan Wood at pp. 446-48).

6.      Frontline and Wood disclosed Mezzo's recuperator concept on Frontline's website without permission.

      (a)      On October 5, 2008, Kelly sent Wood an e-mail thanking Wood for a better copy of the Non-Disclosure Agreement. The email discussed various breaches of the Non-Disclosure Agreement on Frontline's part. Specifically, the e-mail provided "the image [on Frontline's website] represented, in my opinion a clear violation of

the Non-Disclosure Agreement. It was obviously also a violation of copyright law since the sketch was produced by a Mezzo employee, yet no credit was given to Mezzo." Wood's "knowledge of recuperators was close to zero when Kelly and Wood met. Yet, "a few months later, an image [Mezzo supplied Wood] is on the web as a trade marked product. The use of microchannels was only one of the design features (the other being the large area achieved **by corrugation**)." (Plaintiff's Exhibits 42 and 43). Wood never refuted this. Wood agreed to remove and replace the image. (Plaintiff's Exhibit 41).

H.    As A Remedy For Wood's And Frontline's Violation Of The Louisiana Trade Secrets Act, Mezzo Is Entitled To An Injunction Against Further Disclosure, Money Damages, And Attorney's Fees.

The Act provides two essential avenues of relief: injunctive relief and monetary relief.[9] The express terms of the Act allow injunctive relief to enjoin misappropriation.[10] Even where the trade secret ceases to exist, the injunction can be extended "for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."[11] Even when an injunction is lifted, a Court can "condition future use upon payment of a reasonable royalty[.]"[12] Under the Act, damages can also be levied for actual loss caused by misappropriation or for unjust enrichment[13] and attorney's fees can also be

---

[9] R.S. 51:1342 and 51:1343.
[10] R.S. 51:1342(A).
[11] R.S. 51:1342(A).
[12] R.S. 51:1342(B).
[13] R.S. 51:1433.

400158.1

awarded.[14] Thus, there need be no showing of actual damages to recover under the Act. Injunctive relief and royalties may also be awarded for misappropriation.

1.    Mezzo is entitled to an injunction prohibiting Wood from further disclosure of the trade secrets he misappropriated and any trade secrets he has not yet disclosed.

2.    Mezzo is entitled to monetary damages.

    (a)    Kevin Kelly testified that Mezzo's damages were $250,000 (Testimony of Kevin Kelly at p. 125).

    (b)    Kelly testified that the normal royalties were between 5 and 10%. (Testimony of Kelly at p.129). With Wood claiming a $510 million dollar market that would result in $25 million dollars in lost royalties, at a minimum.

3.    Mezzo is entitled to attorney's fees in the amount to be determined after the Court's ruling on the merits.

## II.    WOOD AND FRONTLINE BREACHED THE NON-DISCLOSURE AGREEMENT.

The theft of trade secrets section above goes through great detail on the creation of a confidentiality agreement between Mezzo and Wood and Frontline. It is the breach of that confidentiality agreement that is the basis of the breach of contract claim. For the Court's convenience, the finding of facts and conclusions of law that overlap are repeated here.

A.    <u>Wood And Frontline Breached The Non-Disclosure Agreement.</u>

C.C. art 1927 provides that offer and acceptance can be "made orally, in writing, **or by action or inaction under the circumstances is clearly indicative of consent.**"[15] Further,

---

[14] R.S. 51:1434.

400158.1

unless specified in the offer, there is no need for conformity "between the manner in which the offer is made and the manner in which it is accepted."[16] Here, Mezzo performed by divulging its intellectual property thinking it was operating under cloak of protection brought by the Non-Disclosure Agreement; thus, it clearly had agreed to enter into the Non-Disclosure Agreement. Finally, contracts must be performed in good faith.

    1.    The Non-Disclosure Agreement.

        a.    There was an oral agreement not to disclose Mezzo's information.

            (i)    In January 2008, Mezzo and Frontline entered into an oral Non-Disclosure Agreement (Testimony of Kevin Kelly at pp. 49-60).

        b.    There was a written Non-Disclosure Agreement.

            (i)    Wood signed and forwarded to Mezzo a written Non-Disclosure Agreement at least three times. (Plaintiff's Exhibits 3, 4, 5, 6, 19, 38 and 45).

                (A)    Kelly forwarded a Non-Disclosure Agreement to Wood in January 2008 and indicated that the Non-Disclosure Agreement must be signed before Mezzo's information will be shared with Wood or Frontline (Testimony of Kevin Kelly at p. 56; Plaintiff's Exhibit 7).

---

[15] C.C. art. 1927 states:
    A contract is formed by the consent of the parties established through offer and acceptance.
    Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
    Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

[16] C.C. art. 1927.

(B)   Understanding that Mezzo's confidential trade secrets and intellectual property must be protected prior to engaging in this type of work, Kelly e-mailed Wood a Non-Disclosure Agreement. (Plaintiff's Exhibit 7; Testimony of Kelly at p. 56-57).

(C)   Wood executed and returned the Non-Disclosure Agreement via e-mail and via fax. (Plaintiff's Exhibit 8; Testimony of Kevin Kelly at pp. 57-58; Testimony of Ryan Wood at p. 222).

(D)   Wood testified that the Agreement was effective January 10, 2008. (Testimony of Ryan Wood at pp. 223-224).

(E)   The Design Report and Quotation were all transmitted to Frontline and Wood after January 10, 2008. (Plaintiff's Exhibits 12 and 13).

(F)   It was Kelly's understanding that Wood agreed to the terms of the Non-Disclosure Agreement, and he was not going to disclose Mezzo's information. (Testimony of Kevin Kelly at p. 59).

(G)   Wood expressly acknowledged that the Non-Disclosure Agreement was binding and agreed to comply with the terms of the Non-Disclosure

Agreement when he terminated it. (Plaintiff's Exhibit 50; Testimony of Kevin Kelly at pp. at 80-81; Testimony of Ryan Wood at p. 238).

(H)    Wood forwarded a signed copy of the Non-Disclosure Agreement to Mezzo in October 2008, and indicated that it was the agreement between the parties. (Testimony of Kevin Kelly at p. 77; Plaintiff's Exhibit 45).

(I)    Wood never asked for a copy of the Non-Disclosure Agreement signed in January 2008, by Kelly. (Testimony of Kevin Kelly at pp. 60; 73; Testimony of Ryan Wood at p.238).

(J)    Kelly indicated to Wood that everything was confidential in March 2008. (Testimony of Kevin Kelly at p. 75; Testimony of Ryan Wood at p. 254).

(K)    Wood placed his copy of the Non-Disclosure Agreement in the binder where he keeps all of his other enforceable Non-Disclosure Agreements, thereby demonstrating that Wood thought he had a binding agreement even without the signature of Kevin Kelly (Testimony of Ryan Wood at p. 396).

(L)    Wood terminated the Non-Disclosure Agreement, thereby indicating that he thought there was a

binding agreement even though he did not have a copy with Kevin Kelly's signature. (Testimony of Ryan Wood at p. 230).

    (M)    Wood closes his November 14, letter at "we will continue to comply with the terms of the now terminated agreement." (Plaintiff's Exhibit 50).

2.    Mezzo's confidential information was taken in violation of the NDA.

    a.    Wood's patent application copied the diagrams in the Mezzo Design Report. (Testimony of Kevin Kelly at pp. 100-105).

    b.    Mezzo did not authorize Wood to use the diagrams. (Testimony of Kevin Kelly at p. 109; Testimony of Ryan Wood at p. 231).

    c.    Wood copied the diagrams from the Quotation without authorization and used them in his patent application. (Testimony of Kevin Kelly at p. 109).

    d.    Specifically, Wood acknowledged, under oath, that Figures 6 and 7, Figure 8, Figure 9, Figure 10A, were used without Mezzo's permission. Consequently, Wood's statement to the Patent Office, under the penalty of perjury, that he was the owner and inventor of these concepts is false. (Testimony of Kevin Kelly at pp. 116-117).

    e.    Wood not only copied the diagrams he copied the concepts as well. (Testimony of Kevin Kelly at p. 117).

f.      Moreover, Wood further acknowledged that Figure 11A is from Mezzo and is the "brain design" that Wood said he considered confidential and proprietary to Mezzo. Wood also admitted that Figures 11B and 11C were also Mezzo designed property Moreover, Wood clearly acknowledged, under oath, that it is the recuperator – Mezzo's recuperator that is the true novel portion of his claim 13. (Testimony of Ryan Wood at pp. 235-240).

g.      Frontline's expert, Dr. Kandlikar, testified that the diagrams in the patent application were copied from Mezzo's Design Report. Frontline's own expert acknowledged the taking of the diagrams. (Testimony of Dr. Kandlikar at p. 512).

3.      Wood and Frontline breached their duty of confidentiality by numerous unauthorized disclosures.

a.      Disclosure to the patent office and resulting publication.

An invention held as a trade secret can become the subject of a U.S. patent application legitimately, when such application is filed by the actual inventor(s). In such case, the trade secret information regarding the invention and how to make and use it are revealed in the patent application in accordance with 35 U.S.C. § 112, and is made publicly available by the Patent Office when the application is published under 35 U.S.C. § 122, or at the latest, when the patent is issued. Once published or issued as a patent, the information disclosed in the patent

application becomes public and is no longer secret, having in most cases a destructive effect upon the trade secret status of the information contained in the application.[17]

    (i)    Wood submitted Mezzo's concepts and diagrams to the Patent Office; thereby breaching his obligation to keep the information confidential. (Defendant's Exhibit 59; Testimony of Ryan Wood at p. 261).

    (ii)    Wood and Frontline did not have Mezzo's permission to disclose the information to the Patent Office. (Testimony of Ryan Wood at p. 262).

    (iii)    Wood testified that the diagrams and "brain design" were proprietary to Mezzo. (Testimony of Ryan Wood at pp. 235-240).

    (iv)    The Patent Office published the patent with Mezzo's confidential information. (Defendants' Exhibit 59).

b.    Wood and Frontline disclosed Mezzo's confidential and proprietary information to Geoff Campbell of Microvection, Inc.

    (i)    Frontline and Wood disclosed Mezzo's recuperator concept to Geoff Campbell of Microvection, Inc. (Testimony of Ryan Wood at p. 243; Plaintiff's Exhibit 10).

    (ii)    Mezzo did not give permission to Frontline or Wood to disclose the confidential and proprietary information to Geoff Campbell. (Testimony of Ryan Wood at p. 244).

c.    Disclosure to Mark Waters.

---

[17] *Tewari De-ox Systems, Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611-612 (5th Cir. 2011).

400158.1

       (i)     Frontline and Wood disclosed Mezzo's recuperator concept to Mark Waters. (Testimony of Ryan Wood at p. 241; Plaintiff's Exhibits 21, 22 and 23).

       (ii)    Mezzo did not give permission to Frontline and Wood to disclose the confidential and proprietary information to Mark Waters. (Testimony of Ryan Wood at p. 241-42).

d.    Frontline and Wood disclosed Mezzo's recuperator concept to Engineering TV without permission.

       (i)     Frontline and Wood disclosed Mezzo's recuperator concept to Engineering TV. (Plaintiff's Exhibit 44).

       (ii)    Mezzo did not give permission to Frontline and Wood to disclose the confidential and proprietary information to Engineering TV. (Plaintiff's Exhibit 44).

e.    Frontline and Wood disclosed Mezzo's recuperator concept to potential investors without permission.

       (i)     Frontline and Wood disclosed Mezzo's recuperator concept to Third Coast Capital, Alliance Warburg Capital, Michael Calloway and the Phoenix Group without Mezzo's permission. (Testimony of Ryan Wood at pp. 446-48).

f.    Frontline and Wood disclosed Mezzo's recuperator concept on Frontline's website without permission.

       (i)     On October 5, 2008, Kelly sent Wood an e-mail thanking

Wood for a better copy of the Non-Disclosure Agreement. The email discussed various breaches of the Non-Disclosure Agreement on Frontline's part. Specifically the e-mail provided "the image [on Frontline's website] represented, in my opinion a clear violation of the Non-Disclosure Agreement. It was obviously also a violation of copyright law since the sketch was produced by a Mezzo employee, yet no credit was given to Mezzo." Wood's knowledge of recuperators was close to zero when Kelly and Wood met. Yet, "a few months later, an image [Mezzo supplied Wood] is on the web as a trade marked product. The use of microchannels was only one of the design features (the other being the large area achieved **by corrugation**)." (Plaintiff's Exhibits 42 and 43). Wood never refuted this. Wood agreed to remove and replace the image.

B. <u>Remedy For Breach Of Contract</u>

    1. Specific performance.

        a. One remedy for a breach of a contract is an order for specific performance. Specific performance would be an order preventing Wood and Frontline from making any further disclosures.

        2. Damages

a.     Kevin Kelly testified that Mezzo's damages were $250,000. (Testimony of Kevin Kelly at p. 125).

b.     Kelly testified that the normal royalties were between 5 and 10%. (Testimony of Kelly at p. 129). With Wood claiming a $510 million dollar market that would result in $25 million dollars in lost royalties, at a minimum.

## III. THE '031 PATENT SHOULD BE ASSIGNED TO MEZZO, BECAUSE KEVIN KELLY IS THE SOLE INVENTOR AND WAS AND IS OBLIGATED TO ASSIGN THAT INVENTION TO MEZZO UNDER HIS EMPLOYMENT CONTRACT.

For purposes of U.S. patent law, an inventor is a natural person who, alone or with other natural persons, conceives of new and useful subject matter which is patent-eligible under 35 U.S.C. § 101. Under 35 U.S.C. § 103, in order to be patentable, such invention also must be non-obvious to a hypothetical person having ordinary skill in the art to which the invention pertains. Patentable inventions typically are owned, at the outset, by the actual human inventor(s).[18] In determining who the inventor(s) are, conception is the touchstone of the analysis.[19] Conception is "the formulation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."[20]

When one or more persons claiming to be an inventor file a U.S. patent application, each person listed as an inventor must sign an oath.[21] The oath must include a statement that the

---

[18] *Regents Of University Of New Mexico v. Knight*, 321 F.3d 1111, 1118–19 (Fed. Cir. 2003) ("[I]nitial ownership of a patent vests in the inventor by operation of law ... ."); *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000) ("The general rule is that an individual owns the patent rights to the subject matter of which he is an inventor ... ."); *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("[T]he patent right initially vests in the inventor ....").

[19] *See, e.g., Burroughs Wellcome Co. v. Barr Labs. Inc.*, 40 F.3d 1223, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994).

[20] 1 ROBINSON ON PATENTS § 376.

[21] 37 C.F.R. 1.64.

400158.1

person making it acknowledges the duty to disclose to the Patent Office all information known to the person to be material to patentability.[22] It must also state that the person making the oath believes the named inventor or inventors to be the original and first inventor or inventors of the subject matter which is claimed and for which a patent is sought.[23]

A.    Kelly is the sole inventor of the recuperator described in the '031 patent, because Kelly is the only natural person who conceived of a recuperator using an annually arranged serpentine/corrugated bank of microtubes and the various details relating thereto.

1.    Kelly came up with the corrugated wall, bank of microtubes annular design for a recuperator. (Testimony of Kevin Kelly at p. 166).

2.    The Mezzo design is novel in the use of an annularly configured corrugated wall of microtubes architecture between the headers. (Testimony of Kevin Kelly at p. 34).

3.    Kelly used the Mezzo correlations, databases, experiment results and process to create the corrugated microtube recuperator at issue in the '031 patent. (Testimony of Kevin Kelly at pp. 48-50).

4.    Dr. Kandlikar, Frontline's expert, testified that in his search of the open literature, the only place that identifies an annular, corrugated micro-tube heat exchanger is the Mezzo design report .(Testimony of Dr. Kandlikar at pp. 538-539. ).

5.    Wood stated that he had never seen a design like Mezzo's before. (Testimony of Ryan Wood at p. 254).

---

[22] 37 C.F.R. § 1.63(b).
[23] 37 C.F.R. § 1.63(a).

400158.1

6.   Wood stated that Kelly's corrugated wall microtube recuperator design was novel. (Testimony of Ryan Wood at p. 257).

7.   Wood acknowledged that he did not invent the recuperator. (Testimony of Ryan Wood at p.245).

8.   Kevin Kelly prepared the design report that was forwarded to Wood and Frontline. (Testimony of Kevin Kelly at pp. 98-99).

9.   Kevin Kelly prepared the Quotation that was forwarded to Wood and Frontline. (Testimony of Kevin Kelly at pp. 98-99).

10.  Wood's patent application copied the diagrams in the Mezzo design report. (Testimony of Kevin Kelly at pp. 109-110).

11.  Mezzo did not authorize Wood to use the diagrams. (Testimony of Kevin Kelly at p. 109; Testimony of Ryan Wood at p. 231).

12.  Wood copied the diagrams from the Quotation without authorization and used them in his patent application. (Testimony of Kevin Kelly at p. 109).

13.  Specifically, Wood acknowledged, under oath, that Figures 6 and 7, Figure 8, Figure 9, Figure 10A, were used in the patent application that led to the '031 patent without Mezzo's permission. (Testimony of Kevin Kelly at pp. 116-17).

14.  Wood not only copied the diagrams used in the patent application that led to the '031 patent he copied the concepts as well. (Testimony of Kevin Kelly at p. 117).

15.  Moreover, Wood further acknowledged that Figure 11A is from Mezzo and is the "brain design" that Wood said he considered confidential and

proprietary to Mezzo. Wood also admitted that Figures 11B and 11C were also Mezzo designed property Moreover, Wood clearly acknowledged, under oath, that it is the recuperator – Mezzo's recuperator that is the true novel portion of his claim 13. (Testimony of Ryan Wood at pp. 235-240).

Based upon these facts, the only conclusion that can be reached is that Kevin Kelly is the sole inventor of the invention claimed in the '031 patent. The patent must be corrected by a Certificate of Correction or otherwise to reflect Dr. Kelly as the sole inventor, in order to identify the real inventor and correct the chain of title.

B.    Wood Is Not An Inventor.

"One who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor.[24] Therefore, the critical question for joint inventorship is that of who conceived, as that term is used in the patent law, the new and non-obvious subject matter of the claims at issue.

One who engages in **derivation** of his contributions to the alleged joint invention, is not an inventor. A person is said to have derived knowledge of the invention when he or she did not participate as an inventor, but instead merely received the knowledge from another. See in this regard, 35 U.S.C. § 102(f), which bars a person from obtain a patent if "he did not invent the subject matter sought to be patented. . . .

1.    Wood admits that he did not invent the recuperator. the facts that lead to this conclusion are:

---

[24] *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (*citing Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 981, 41 USPQ2d 1782 (Fed.Cir.), *cert. denied*, 520 U.S. 1277, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997)).

a. Wood stated that he had never seen a design like Mezzo's before. (Testimony of Ryan Wood at p. 254).

b. Wood stated that Kelly's corrugated wall microtube recuperator design was novel. (Testimony of Ryan Wood at p. 257).

c. Wood acknowledged that he did not invent the recuperator. (Testimony of Ryan Wood at p.245).

d. Kevin Kelly prepared the design report that was forwarded to Wood and Frontline. (Plaintiff's Exhibit 12).

e. Kevin Kelly prepared the Quotation that was forwarded to Wood and Frontline. (Plaintiff's Exhibit 13).

f. Wood's patent application copied the diagrams in the Mezzo design report. (Testimony of Kevin Kelly at pp. 109-110).

g. Mezzo did not authorize Wood to use the diagrams. (Testimony of Kevin Kelly at p. 109; Testimony of Ryan Wood at p. 231).

h. Wood copied the diagrams from the Quotation without authorization and used them in his patent application. (Testimony of Kevin Kelly at p. 109).

i. Specifically, Wood acknowledged, under oath that Figures 6 and 7, Figure 8, Figure 9, Figure 10A, were used in the patent application that led to the '031 patent without Mezzo's permission. (Testimony of Kevin Kelly at pp. 116-17).

j. Wood not only copied the diagrams used in the patent application

that led to the '031 paten he copied the concepts as well. (Testimony of Kevin Kelly at p. 117).

k.  Moreover, Wood further acknowledged that Figure 11A is from Mezzo and is the "brain design" that Wood said he considered confidential and proprietary to Mezzo. Wood also admitted that Figures 11B and 11C were also Mezzo designed property. Moreover, Wood clearly acknowledged, under oath, that it is the recuperator – Mezzo's recuperator that is the true novel portion of his claim 13 (Testimony of Ryan Wood at pp. 235-240).

2.  Wood claims his contribution to the invention was that he conceived of putting a recuperator on a Rolls Royce engine. (Testimony of Ryan Wood at p. 373). This is incorrect, Wood did not conceive of recuperating a Rolls Royce Engine. The facts which lead to this conclusion are:

a.  In 2004, Rolls Royce prepared a report for the United States Army that discussed recuperating a Rolls Royce Engine (Plaintiff's Exhibit 11). This document was in Wood and Frontline's possession and its content was well known to them. As a result, Wood could not have conceived of the idea independently, as he would simply be deriving it from the Rolls Royce disclosure in his possession.

b.  Wood and Frontline's expert testified that Wood did not conceive a solution; rather he only identified a design problem (Testimony of Dr. Kandlikar at p. 489;550). The same design problem was

already known from the Rolls Royce report in Wood's possession. Recognition of a known design problem is not an invention.

    c.    Wood acknowledged that he did not invent the recuperator. (Testimony of Ryan Wood at p. 245).

3.    Wood merely provided known technical specifications of engine performance to Mezzo.

    a.    Wood obtained the technical information regarding the engine from:

        (i)    A master's thesis that was publicly available;

        (ii)    The 2004 Army report (Plaintiff's Exhibit 11);

        (iii)    Rolls Royce (See Report of Mark Waters; Plaintiff's Exhibits 21 and 22); and

        (iv)    Oak Ridge National Laboratories (Plaintiff's Exhibit 18).

4.    Wood signed a false declaration of inventorship

    a.    Wood signed a declaration of inventorship when he submitted his secret and unauthorized patent application. (Plaintiff's Exhibit 50).

    b.    Wood admitted the oath was false. (Testimony of Ryan Wood at p. 244).

C.    <u>Kevin Kelly is the proper owner of the '031 patent subject to his contractual obligation to assign ownership therein to Mezzo, his employer (See Plaintiff's Exhibit 54 Section 3).</u>

Initial title to patent rights in an invention resides in the inventor (or joint inventors) in all cases. If joint inventorship is present, United States patent law awards each joint inventor an

undivided interest in the entire patent.[25]  Independent contractors who invent in the course of the provision of services to another do not implicitly assign their entire right, title and interest to the trade secrets and inventions made during the provision of services to the contracting party, in the absence of facts and circumstances justifying such an implied assignment or grant of other rights.[26]

As discussed above, Kevin Kelly is the inventor.  As a result of his inventorship, initial ownership vests with Kevin Kelly until he assigns it.  Kelly specifically assigned and promised to assign to Mezzo all of his inventions made in the course and scope of his employment with Mezzo (Plaintiff's Exhibit 54), and the entire testimony and evidence in this case illustrates that Kelly never intended to assign or license any of his rights, or any of Mezzo's rights, in the intellectual property set forth in the reports provided to Wood, in the absence of an express, written agreement confecting the hoped-for business transaction.

### 1. Kelly never assigned any rights to Wood or Frontline

Section 261 of Title 35 specifically states that "patents shall have the attributes of personal property," and that "[a]pplications for patents, patents or any interest therein, shall be assignable in law by an instrument in writing."[27]  To the extent that ownership of the patent rights exists in another person or entity other than the actual inventor(s), it must be created by transfer via contract or other conveyance in the general law of property.[28]

a.  There is no written assignment of ownership of the annular,

---

[25] 35 U.S.C.A. § 262.

[26] *Tucker v. Oregon Aero, Inc.*, 474 F. Supp. 2d 1192 (D. Or. 2007).

[27] 35 U.S.C.A. § 261.

[28] *Catherine Fisk, Removing the "Fuel of Interest" from the "Fire of Genius": Law and the Employee-Inventor, 1830–1930,* 65 U. Chi. L. Rev. 1127 (1998).*DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.,* 517 F.3d 1284, 85 U.S.P.Q.2d 1942 (Fed. Cir. 2008).

400158.1

corrugated wall bank of microtube recuperator from Kelly to

Wood or Frontline.

b. The design report, which is the document Wood claims transfers

title, is clearly marked proprietary and confidential to Mezzo; It

does not transfer title.

## IV. WOOD AND FRONTLINE COMMITTED FRAUD BY REPEATEDLY INDICATING THAT THEY WOULD KEEP MEZZO'S INFORMATION CONFIDENTIAL WHEN ALL ALONG THEY INTENDED TO USE IT TO OBTAIN A PATENT.

La. Civil Code article 1953 provides:

"Fraud is a misrepresentation of a suppression of the truth made with the intention either

to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other party.

Fraud may also result from silence or inaction."

Wood and Frontline's first act of fraud was that they intended to, and did, obtain Mezzo's

technology and use it to obtain a patent of Mezzo's technology after signing a Non-Disclosure

Agreement with confidentiality and non-use provisions. Wood and Frontline's second act of

fraud was misrepresenting that they would honor the Non-Disclosure Agreement which they

acknowledged was in place, by keeping the relevant information confidential. These conclusions

are made clear from the following findings of fact:

A. In January 2008, Wood and Frontline orally agreed with Mezzo to

keep any Mezzo information sent to them confidential. (Testimony

of Kevin Kelly at pp. 49-60).

B. Wood signed and forwarded to Mezzo a written signed by him Non-

Disclosure Agreement at least three times and at least twice after he had

already taken Mezzo's designs and incorporated them in his patent application.. (Plaintiff's Exhibits 3, 4, 5, 6, 19, 38, and 45).

C.     Kelly forwarded an Non-Disclosure Agreement to Wood in January 2008 and indicated that the Non-Disclosure Agreement must be signed before Mezzo information would be shared with Wood or Frontline (Testimony of Kelly at 56; Plaintiff's Exhibit 7)..

D.     Wood executed and returned the Non-Disclosure Agreement via e-mail and via fax. (Plaintiff's Exhibit 4 and 5; Testimony of Kevin Kelly at pp. 56-58; Testimony of Ryan Wood at p. 222).

E.     Wood testified that the Agreement was effective January 10, 2008. (Testimony of Ryan Wood at pp. 223-224).

F.     It was Kelly's understanding that Wood agreed to the terms of the Non-Disclosure Agreement, and Wood was not going to disclose Mezzo's information. (Testimony of Kevin Kelly at p. 59).

G.     Wood expressly acknowledged that the Non-Disclosure Agreement was binding and agreed to comply with the terms of the Non-Disclosure Agreement when he terminated it. (Plaintiff's Exhibits 45 and 50; Testimony of Kevin Kelly at p. at 80-81; Testimony of Ryan Wood at p. 238).

H.     Wood terminated the Non-Disclosure Agreement in October, 2008 after he had already taken Mezzo's designs and incorporated them into his patent

application because he thought the Non-Disclosure Agreement was effective. (Testimony of Ryan Wood at p. 230).

I.     Wood closes his November 14, 2008 letter at "we will continue to comply with the terms of the now terminated agreement" even though he had already copied Mezzo's diagrams and used them in his patent application. (Plaintiff's Exhibit 50).

J.     Confidential information included Mezzo's drawings and designs. (Testimony of Ryan Wood at pp. 225-28; Plaintiff's Exhibits 3 and 4).

K.     Mezzo prepared a design report on February 4 and marked it proprietary and confidential (Testimony of Kevin Kelly at pp. 98-99; Plaintiff's Exhibit 26).

L.     Wood's patent application copied the diagrams in the Mezzo design report. (Testimony of Kevin Kelly at pp. 109-110).

M.     Mezzo did not authorize Wood to use the diagrams. (Testimony of Kevin Kelly at p. 109; Testimony of Ryan Wood at p. 231).

N.     Wood copied the diagrams from the Quotation without authorization and used them in his patent application. (Testimony of Kevin Kelly at p. 109).

O.     Specifically, Wood acknowledged, under oath that Figures 6 and 7, Figure 8, Figure 9, Figure 10A, were used in the patent application that led to the '031 patent without Mezzo's permission. (Testimony of Kevin Kelly at pp. 116-17).

P.   Wood not only copied the diagrams used in the patent application that led to the '031 patent he copied the concepts as well. (Testimony of Kevin Kelly at p. 117).

Q.   Moreover, Wood further acknowledged that Figure 11A is from Mezzo and is the "brain design" that Wood said he considered confidential and proprietary to Mezzo. Wood also admitted that Figures 11B and 11C were also Mezzo designed property Moreover, Wood clearly acknowledged, under oath, that it is the recuperator – Mezzo's recuperator that is the true novel portion of his claim 13 (Testimony of Ryan Wood at pp. 235-240).

These facts demonstrate that Wood and Frontline committed fraud by action in continuing to tell Mezzo and Kelly that they would comply with the Non-Disclosure Agreement while they were in fact taking Mezzo's ideas and using them to obtain a patent. Further, Wood and Frontline committed fraud by silence in failing to tell Mezzo, Wood was filing a patent application and intending to argue that the NDA was invalid.

The remedy for fraud is ordering that the patent be assigned back to Mezzo and Wood and Frontline be found liable for Mezzo's attorney's fees and costs.

## V.   WOOD'S AND FRONTLINE'S DEFENSES FAIL.

Wood raises two defenses to the claims of Mezzo: (1) that Kelly and Mezzo did not have standing to challenge inventorship and ownership of the patent because the intellectual property belonged to LSU; and (2) that Mezzo assigned the rights to Wood for $5,000 when he paid for the preparation of the February design report.

A.   Kelly And Mezzo Have Standing To Sue. Kevin Kelly Was Not An LSU Employee or LSU Personnel During Any Period Where He Could Have Created Ideas Subsequently Misappropriated by Frontline and Wood.

*The rights in any invention arising out of the Mezzo trade secrets were subject to ownership by Mezzo alone. These inventions were not created by any LSU employees, they were created by Mezzo employees.*

Mezzo has standing to sue for misappropriation of its trade secrets, which include *inter alia* the work product set forth in confidential design reports created by Dr. Kelly, building upon earlier patent-pending micro-tube heat exchanger technology previously developed by other Mezzo employees. Elements of those confidential design reports were later copied and used by Wood and Frontline in preparing and filing a secret patent application.

Frontline and Wood argue that Dr. Kelly was the sole inventor and creator of the ideas that serve as the wellspring for its patent and that Dr. Kelly was an LSU employee at the time that the ideas were conceived. Frontline and Wood thus claim that LSU is the only party with standing to raise these issues. The LSU bylaws, testimony, and prevailing jurisprudence, however, show that Dr. Kelly was not an employee at the time he conceived any portion of the alleged idea – LSU personnel does not include LSU employees on unpaid leave. Frontline's construction relies on PMs that clearly conflict with the bylaws.

1. Kevin Kelly submitted his resignation from LSU in November 2007. (Testimony of Kevin Kelly at p. 42).

2. LSU did not pay Kevin Kelly after May of 2007. (Testimony of Kevin Kelly at p. 42.)

3. Kevin Kelly was on unpaid leave starting in May of 2007. (Testimony of Kevin Kelly at p. 42).

4. Kevin Kelly did not receive any remunerative benefit from LSU whatsoever after May of 2007. (Testimony of Kevin Kelly at p. 42).

5.      The LSU bylaws, §7.2(a) define "LSU Invention" as one that is "either conceived or first reduced to practice, in whole or in part, during activities that are (1) carried on by, or under the direction of, LSU personnel ..." (Defendants' Exhibit 33).

6.      The LSU bylaws, §7.2(m) define "LSU Personnel" in pertinent part, as "all LSU Supervisors, Officers, Faculty, Staff, Research Associates, Postdoctoral Fellows, Instructors, Graduate Students, and other employees of LSU, whether part-time or full-time. LSU Personnel shall include, for example: (1) faculty or other LSU personnel who are on nine-month appointments, who shall be considered LSU Personnel throughout the calendar year for purposes of this Chapter VII of the bylaws ..." (Defendants' Exhibit 33).

7.      The LSU Bylaws defining LSU Inventions and LSU Personnel do not mention or address LSU employees that are on unpaid leave. (Testimony of Peter Kelleher at p. 348 and Defendants' Exhibit 33).

8.      The LSU Bylaws, introduced into evidence, contain no reference to PM, permanent memoranda, or president's memoranda. (Defendants' Exhibit 33).

9.      The LSU Bylaws, introduced into evidence, contain no language allowing reference to, enlargement by, or incorporation of any PM, permanent memoranda, or president's memoranda. (Testimony of Peter Kelleher at p. 349; Defendants' Exhibit 33).

10. Thus, Kevin Kelly was not an LSU employee or LSU personnel after May of 2007.

B. Kelly And Mezzo Have Standing To Sue. Kevin Kelly Did Not Assign Any Of The Intellectual Property Rights At Issue In This Case To LSU Or Any Other Entity.

Even if, for argument sake, Dr. Kelly was (1) the sole inventor and (2) was an LSU employee – on unpaid leave – at the moment of conception of the idea, the language in various LSU rules and regulations, relied upon by Frontline and Wood, require an assignment of those rights. This language can only be construed as an agreement to take the actual step of executing an assignment of rights, which there was no evidence at trial of this taking place; the language does not effect an immediate assignment to LSU or reflect a present-tense assignment. Thus, no assignment to LSU took place upon conception by Dr. Kelly or by operation of law, unless and until he actually executed a written assignment. The prevailing federal jurisprudence supports this conclusion, finding that language in agreements that reflects an intention to assign in the future, without a contemporaneous or subsequent actual assignment, does not vest legal title to intellectual property rights.[29]

As a result, because Kelly was no longer an employee of LSU and is the owner of his inventions until he executes a present assignment, only Kelly and Mezzo have the legitimate

---

[29] *Arachnid, Inc. v. Merit Ind., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) (The appellate court reversed a patent infringement damage award because the plaintiff's claim to rights in the intellectual property was premised on contract language that the inventor's rights "will be assigned." However, no actual assignment had been made to the plaintiff prior to or during the period of the alleged infringement; as such, the plaintiff had no standing as it did not have legal title.); and *IPVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324 (Fed. Cir. 2008) (Language in an agreement where an inventor stated he would "agree to assign" does not operate as an automatic assignment to the obligee of that contract vesting legal title to the intellectual property right at issue). *Cf. Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) (where the appellate court distinguished cases dealing with contracts with language that contemplates an agreement to assign as opposed to language in a contract that conveys a contemporaneous, present-tense assignment). *See also*, generally, *B'd of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, __ U.S. __, 131 S.Ct. 2188, 180 L.Ed.2d 1 (2011).

claims to ownership of the patent rights, and Mezzo has standing to bring the claims in this case relating to both the trade secrets and the rights in an invention arising from those trade secrets.

1. The LSU bylaws, §7.3(a) addresses disposition of LSU Intellectual Property. (Defendants' Exhibit 33).

2. The LSU bylaws, §7.3(a) states that LSU Personnel "shall execute any formal assignments to LSU ..." (Defendants' Exhibit 33).

3. This language in §7.3(a) regarding assignments of LSU Intellectual Property is not self-executing, or cannot be construed to affect a present-tense automatic assignment; the language contemplates that an act of assignment must be undertaken and executed.

4. Kevin Kelly never confected or executed an assignment of any of the intellectual property rights at issue in this case to LSU.

5. As there was no assignment of the intellectual property rights at issue in this case, LSU has no actual ownership interest in the rights at issue. [30]

C. Kelly Did Not Sell Mezzo's Recuperator Or Recuperator Design To Wood For $5,000.

Wood argues that because he paid $5,000 for Kelly to prepare the design report he owns the report and the intellectual property rights in all concepts and ideas disclosed therein. In so far as the patent rights are concerned, he is incorrect to suggest that he owns them merely as a result

---

[30] *Arachnid, Inc. v. Merit Ind., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) (The appellate court reversed a patent infringement damage award because the plaintiff's claim to rights in the intellectual property was premised on contract language that the inventor's rights "will be assigned." However, no actual assignment had been made to the plaintiff prior to or during the period of the alleged infringement; as such, the plaintiff had no standing as it did not have legal title.); and *IPVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324 (Fed. Cir. 2008) (Language in an agreement where an inventor stated he would "agree to assign" does not operate as an automatic assignment to the obligee of that contract vesting legal title to the intellectual property right at issue). *Cf. Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) (where the appellate court distinguished cases dealing with contracts with language that contemplates an agreement to assign as opposed to language in a contract that conveys a contemporaneous, present-tense assignment). *See also*, generally, *B'd of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, ___ U.S. ___, 131 S.Ct. 2188, 180 L.Ed.2d 1 (2011).

of a payment of funds. Section 261 of Title 35 specifically states that "patents shall have the attributes of personal property," and that "[a]pplications for patents, patents or any interest therein, shall be assignable in law by an instrument in writing."[31] To the extent that ownership of the patent rights exists in another person or entity other than the actual inventor(s), that ownership must be conferred by transfer via contract or other conveyance in the general law of property.[32] Patent law requires any assignment to be in writing.

1.     The February 2008, Design Report, which Wood claims he purchased, is marked proprietary and confidential. (Plaintiff's Exhibit 26).

2.     Wood acknowledged that the "brain design," that he used in the patent application, was proprietary to Mezzo. (Plaintiff's Exhibit 44).

3.     I would fine tune the design for $5,000. I was not transferring ownership the money was for my time in fine tuning the report. The fine tuning led to the design report which was clearly marked confidential and proprietary. (Testimony of Kevin Kelly at p. 96).

    a.     Fine tuning involved creating CAD drawings. (Testimony of Kevin Kelly at p. 96).

    b.     Mezzo would own the drawings. (Testimony of Kevin Kelly at p. 97.)

    c.     Mezzo customers sometimes pay these costs. (Testimony of Kevin Kelly at p. 97.)

4.     There is no writing transferring ownership of Mezzo' design.

---

[31] 35 U.S.C.A. § 261.

[32] *Catherine Fisk, Removing the "Fuel of Interest" from the "Fire of Genius": Law and the Employee-Inventor,* 1830–1930, 65 U. Chi. L. Rev. 1127 (1998). *DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.,* 517 F.3d 1284, 85 U.S.P.Q.2d 1942 (Fed. Cir. 2008).

## VI. WOOD'S AND FRONTLINE'S UNFAIR TRADE PRACTICE COUNTERCLAIM IS WITHOUT MERIT. FILING A LAWSUIT TO PROTECT A TRADE SECRET IS NOT AN UNFAIR TRADE PRACTICE.

Louisiana Unfair Trade Practices Act (LUTPA) provides a means for a proven aggrieved party to recover damages and attorney's fees. La. R.S. 51:1409 outlines what a private party must show to prove a claim for unfair trade practices.[33] In order to prevail, a private party must show (1) an "ascertainable loss of money or movable property, corporeal or incorporeal" that is (2) directly occasioned by the "use or employment ... of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." Acts declared unlawful under La. R.S. 51:1405 are those that arise to "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ..." Only then, upon such a showing, may a party recover "actual damages."[34]

Frontline's and Wood's claims for damages and attorney's fees under LUTPA fails on multiple grounds: (1) because, as a matter of law, filing a lawsuit to address perceived violations of trade secrets or to enforce a contract is not an unfair trade practice; and is not a commercial act as contemplated under La. R.S. 51:1401, *et seq*; (2) because, as a matter of fact, no evidence

---

[33] R.S. 51:1409(A) states, in pertinent part, that any "person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages."

[34] R.S. 51:1409(A). This provision also provides for treble damages, but only where the allegedly aggrieved party has cited and served the Attorney General, and the Attorney General has provided Notice to the allegedly offending party. As Frontline and Wood did not serve the Attorney General, and as Mezzo received no notice from the Attorney General of potential treble damages, no such award can be granted here. *See Laurents v. Louisiana Mobile Homes, Inc.*; 96-976, *9 (La.App. 3 Cir. 2/5/97); 689 So.2d 536, 542 ("Under La.R.S. 51:1409(A), the failure to prove that the director or attorney general put the defendants on notice does not defeat the claim for actual damages and attorney fees, but only defeats the claim for treble damages"); *Mayo v. Simon*, 94-590, *4 (La.App. 3 Cir. 1994); 646 So.2d 973, 975, (claim under LUTPA was preempted, however the Court did state that a plaintiff is entitled to treble damages if he establishes that the defendant knowingly used an unfair trade practice after being put on notice by the Louisiana attorney general. LSA-R.S. 51:1409(A).); *Joseph v. Hendrix*; 536 So.2d 448, 450 (La.App. 1 Cir. 1988) ("The statute does not allow [treble] damages unless the defendant has been put on notice by the director of consumer affairs or the attorney general that he is engaging in an unfair trade practice. The record fails to show that such notice was ever given by the director or the attorney general. The statute, being penal in nature, must be strictly construed. Hence, under La.R.S. 51:1409(A), plaintiff is limited to recovery of actual damages plus attorney's fees and costs.").

of actual damages was properly submitted into evidence before this Court; and (3) because Mezzo and its representatives were clearly reasonable in their belief that a valid Non-Disclosure Agreement had been entered by the parties – and certainly were not intentional or malicious in any action related to the Non-Disclosure Agreement.

A. As A Matter Of Law, Filing A Lawsuit To Address Perceived Violations Of Trade Secrets Or For Reasonably Alleged Breach Of Contract Is Not An Unfair Trade Practice; Therefore Frontline's And Wood's Unfair Trade Practice Claim Fails As A Matter Of Law.

1. Frontline provides no authority from any court in this Circuit, be it federal or state, in support of its allegation that filing a lawsuit is an unfair trade practice. La. R.S. 51:1405 & 51:1409.

2. Filing a lawsuit is an important, elevated right protected under Louisiana's Constitution, excluded from coverage under the Unfair Trade Practices Act. La. Const. art. I, § 22[35]

3. The right to file a lawsuit is protected under Louisiana's Constitution; therefore the Legislature clearly did not intend such action to be considered an "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" under R.S. 51:1405 – meaning this could not be an unfair trade practice under LUPTA.

4. La. R.S. 51:1405[36] notes that prohibited acts are those classified as allegedly unfair or practices made "in the conduct of any trade or commerce."

---

[35] The article notes that all "courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights."

5.     Filing a lawsuit cannot be classified as an act "in the conduct of any trade

or commerce"; Frontline failed to provide any authority or jurisprudence

evidencing that filing a lawsuit fits within the description of the conduct of

"trade of commerce."[37]

B.     <u>As A Matter Of Fact, Frontline And Wood Failed To Introduce Any Evidence Of
Actual Damages; Therefore, Frontline's And Wood's Unfair Trade Practice
Claim Fails As A Matter Of Law.</u>

1.     A plaintiff must be able to show that they have suffered a quantifiable,

ascertainable loss to properly make out and prove an unfair trade practice

has occurred. La. R.S. 51:1409.

2.     Neither Frontline nor Wood showed or provided any evidence of a

quantifiable loss.

3.     Conversely, Mezzo provided evidence that proved that neither Wood nor

Frontline suffered an ascertainable, quantifiable loss.

4.     Wood and Frontline had access to, and claimed to own, Mezzo's design

from April 1, 2008 through all of 2009 and 6 months of 2010, yet both

Wood and Frontline failed to build or sell a recuperator or heat exchanger

based on Mezzo's design. (Testimony of Ryan Wood at p. 448).

5.     According to a 2004 report authored by the United States Army, a similar

26 month span of access to a recuperator design was more than sufficient

time to build the recuperator. (Plaintiff's Exhibit 11).

---

[36] R.S. 51:1405 states, in pertinent part:
    A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or
    commerce are hereby declared unlawful.

[37] While not a Louisiana case, or a case from this Circuit, at least one Court has held that filing a lawsuit is not the
type of act considered to be in commerce so as to come under the umbrella of that state's unfair trade practice law.
*See Allora, LLC v. Willoughby Family Investments, LLC,* 2007 WL 2822907 (D.S.C. 2007) (unreported in Federal
Supplement).

400158.1

6.    Kevin Kelly testified that Mezzo could build a recuperator based on the same design in approximately one hour. (Testimony of Kelly at p. 32).

7.    Neither Wood nor Frontline could sell Mezzo's design concept.

8.    Neither Wood nor Frontline could quantify any quantifiable or ascertainable damage or loss - in monetary terms – from Mezzo's alleged unfair trade practice. (Testimony of Ryan Wood at p. 449).

9.    Frontline has therefore failed to identify, and cannot identify, a second essential element of its LUTPA claim, namely that it has suffered an "ascertainable loss of money or movable property." La. R.S. 51:1409.

C.    Mezzo And Its Representatives Were Clearly Reasonable In Their Belief That A Valid Non-Disclosure Agreement Had Been Entered By The Parties – And Certainly Were Not Intentional Or Malicious In Any Action Related To The Non-Disclosure Agreement; Therefore, Mezzo's Actions Were Not An Unfair Trade Practice And Frontline's And Wood's LUTPA Claim Must Fail.

1.    Ryan Wood signed and returned the Non-Disclosure Agreement multiple times.  (See the references and explanations in this document at § 1.D.)

2.    Frontline admitted that it took Mezzo's information and used it without permission for its own benefit. (See the references and explanations in this document at §§ 1.F and 1.G).

3.    Frontline and Wood additionally admitted in correspondence that they would comply with the Non-Disclosure Agreement while they were secretly ignoring the very terms of that agreement.[38] Mezzo's actions in filing a law suit to protect its trade secret, and for Frontline and Wood's

---

[38] *See* Correspondences of October 6, 2008, FRONTLINE 00292-00294 (where Frontline, considering itself bound by the NDA, informs Mezzo that it is terminating the NDA and that it will delete proprietary information belonging to Mezzo), and correspondence of November 14, 2008, FRONTLINE 00298-00300 (where Frontline informs Mezzo's attorneys that it "will continue to comply with the terms of the now terminated [NDA].").

breach of the Non-Disclosure Agreement was reasonable and not an action that was meant to be or was "deceptive" or "unfair" as contemplated under Louisiana law. La.R.S. 51:1405 & 51:1409.

4. Frontline and Wood have therefore failed to identify, and cannot identify, any action of Mezzo's that could be considered "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" under R.S. 51:1405 – meaning this could not be an unfair trade practice under LUPTA and Frontline and Wood's claim must fail.

## VII. CONCLUSION

At the end of the day, this case boils down to some simple concepts, Kevin Kelly invented a corrugated wall microtube recuperator in an annular shape. Ryan Wood and Frontline took it, without permission, and wrongly claimed it as their own. The Court should make them give it back by assigning the ownership of the patent to Mezzo, listing Kelly as the inventor and ordering Wood and Frontline to pay damages and attorney's fees and enjoining them from disclosing Mezzo's information in the future.

Respectfully submitted:

/s/Juston M. O'Brien
Juston M. O'Brien, La Bar No. 26447
Jamie D. Seymour, La Bar No. 29418
McGlinchey Stafford, PLLC
One American Place
301 Main Street, 14th Floor
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000
Facsimile: (225) 343-3076

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Ryan Johnson by operation of the court's electronic filing system.

Baton Rouge, Louisiana this 3rd day of Feburuary, 2012.

*/s/ Juston M. O'Brien*
Juston M. O'Brien