# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

INTERNATIONAL MEZZO
TECHNOLOGIES, INC.

vs.

FRONTLINE AEROSPACE, INC.
AND RYAN WOOD

CIVIL ACTION

No. 10-397-SCR

## DEFENDANTS' PROPOSED FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

Defendants Frontline Aerospace, Inc. ("Frontline") and Ryan S. Wood ("Wood") (collectively "Defendants," unless noted otherwise), submit these proposed findings of fact and conclusions of law in connection with the bench trial held on October 11-13, 2011.[1]  The plaintiff in this matter is International Mezzo Technologies, Inc ("Mezzo").

For their proposed factual findings, the Defendants have provided a reference to the appropriate page, line and/or exhibit.

## PROPOSED FINDINGS OF FACT

### *Parties*

1.      The parties to this action are plaintiff Mezzo and Defendants Frontline Aerospace and Ryan S. Wood.  Neither Kevin Kelly ("Kelly") or any individuals are named as plaintiffs in this action.

### *Frontline Aerospace and Defendants' Interest in Rolls Royce Model 250 Engine*

2.      In September 2007, after many years in the computer science, engineering and energy fields, Ryan Wood formed Frontline Aerospace.  (363: 6-25, 364:1-2)

3.      Among other projects, Frontline Aerospace was started to develop and build an unmanned aerial vehicle for military and commercial applications.  After extensive research by Mr. Wood, Frontline selected the Rolls Royce Model 250 gas turbine engine as the best choice for its unmanned vehicle.  (364:3-13)

4.      The Rolls Royce Model 250 engine was an ideal choice for Frontline's project because it is a reliable, reasonably-priced and widely-used engine.  (365:4-12)

5.      Wood identified a critical improvement for the Rolls Royce engine which could benefit his proposed project—the use of a "recuperator."   The recuperator, sometimes generally referred to as a heat exchanger, is a small device that could be placed in the engine's exhaust ducts.  Similar in some respects to a radiator, the recuperator would allow compressed air from the engine to be heated in the ducts

---

[1]*See* Rec. Doc. No. 128 (January 9, 2012 Order setting February 3, 2012

and then recycled back into the engine's combustion process. Wood determined that using the recuperator would make the engine more effective and fuel-efficient. (369:10-20)

6.      Wood conducted research through the internet and other sources to locate a company that could construct the recuperator based on his design. Because the recuperator would be placed in the engine's small, rounded exhaust ducts, Wood identified several companies including Mezzo, that appeared to have experience building small-scale recuperators of the type required.

7.      Among other publications, Wood found a publically-available paper published by Kevin Kelly related to small-scale recuperators. (370:1) Kelly is the principal owner and operator of Mezzo and started work there some time in 2000. (28:12)

8.      Wood first contacted Mezzo by email on January 1, 2008. Despite its purported experience in recuperator design and construction, in a January 2, 2008 email, Kelly acknowledged immediately that neither he or Mezzo had ever designed or built a recuperator for a Rolls Royce Model 250 Engine. (376:3-6, Ex. D-4, and 409:1-2)

9.      In fact, until Wood contacted Mezzo, neither Kelly nor anyone at Mezzo had even considered using a combination of a recuperator with this engine. (178:17-25)

10.     It is undisputed that Ryan Wood, not Kevin Kelly, came up with the idea of combining a recuperator with the Rolls Royce 250 Engine. (178:4-8, 17-20)

_____

deadline for submission of parties' Findings of Facts and Conclusions of Law).

### *The Defendants' first dealings with*
### *Mezzo and the alleged Non-Disclosure Agreement*

11.     On January 4, 2008, Kevin Kelly sent Wood an email to which he attached power point slides containing what Kelly described as "several recuperator concepts." (385:14-22, Ex. D-2)

12.     When Kelly sent the January 4, 2008 email, the parties had not discussed or attempted to enter into a confidentiality agreement of any type. (385:21-23)

13.      On January 10, 2008, Kevin Kelly sent Ryan Wood a blank, unsigned and incomplete draft of a non-disclosure agreement. (56: 2-5).  Kelly sent the draft document in a Word format, making it simply a draft that could be edited and changed. (387:17-18)

14.     Other than Mezzo's name, the draft agreement Kelly sent did not mention Frontline or Ryan Wood and contained a 2007 date, suggesting it was a form document left over from a prior transaction. (56:2-5, Ex. P-3)

15.     Kelly acknowledged that he failed to edit the proposed agreement properly before sending it to Wood. (56: 16)

16.     Kelly believed that Wood was supposed to complete and return the agreement sent on January 10, 2008, after which Kelly would sign it, making the agreement, in Kelly's own words, "complete." (56: 4-5)

17.     Wood likewise believed that both parties were required to sign, and that his signature alone would <u>not</u> create a binding contract. (388:23)

18.     On January 10, 2008, Wood placed his electronic signature (i.e., a copy of his signature) on the non-disclosure document and emailed it back to Kelly.  (57:11-12, 389:2-3, Ex P-4)

19.     On the same date, Wood manually signed in blue ink, a copy of the same document and faxed it to Mezzo.   (389: 10-11, 390:9 and Ex. P-5)

20.     Unknown to Wood, he had left a copy of his health insurance card on his fax machine.  (389: 18-25) When the fax was received on Mezzo's end, the insurance card was superimposed on the first page of the fax.   (*Id*)

21.     The copy of the agreement with Wood's insurance card does not have three hole punch marks on it.  (397: 9-13, P-5)

22.     *After* Wood faxed the document to Mezzo, he three-hole punched it and put a copy in a binder where he stored other similar documents. (396:13-25)

23.     Wood explained the timing of the three hole punch marks:  he did not punch the holes in the document until <u>after</u> he faxed the copy to Mezzo, not before.  (396: 18-19)

24.     On March 6, 2008, Kelly sent an email to Wood which confirmed that Kelly had not signed either the fax or email version of the non-disclosure agreement sent to him on January 10, 2008.  (199:20-25, D-28)

25.     On April 17, 2008, Kelly sent another non-disclosure document to Wood. Unlike the one sent on January 10, 2008, this agreement had completed information, contained an up-to-date reference and was signed by Kevin Kelly. (67:7-9, Ex. P-38)

26.     Kelly admitted that he sent this new agreement on April 17, 2008 because he was nervous and realized that he had "not done the NDA right." Kelly believed that the faxed copy was not legally enforceable (not "legal" in his wording) because the insurance card was superimposed on the first page. (67:1-4 and Ex. P-37)

27.     The non-disclosure document signed and sent by Kelly on April 17, 2008 was not the same document that Wood signed and sent back to Mezzo by fax and email on January 10, 2008. (421:4-5)

28.     Wood refused to sign the April 17, 2008 document signed and sent by Kelly. (421:1)

29.     Instead, Wood sent Kelly another copy of the January 10, 2008 non-disclosure document that Wood had sent previously (with his electronic signature), along with another non-disclosure document and a professional services document between Mezzo and Frontline. (424:10-14)

30.     Because the parties' relationship had changed, Wood notified Mezzo that the parties should enter into all three agreements, instead of simply signing the April 17, 2008 agreement proposed by Kelly. (426: 21-25)

31.     Neither Kelly or Mezzo ever sent the Defendants a copy of any non-disclosure agreement with both parties' signature on it. (393:7-9)

32.     In fact, the first time Wood ever saw a signed copy was when Mezzo served him with the complaint and related pleadings and attached a copy of what was purported to be a fully executed and binding copy of the agreement. (393:7-9)

Kelly confirmed that neither he nor Mezzo ever provided a fully executed copy of the agreement to the Defendants until Mezzo filed suit. (133: 20-23)

33.     Mezzo alleged in its complaint that the parties "executed" a non-disclosure agreement on January 10, 2008, although no evidence was introduced to support this allegation. (Complaint, Paragraph 13)

34.     Just the opposite, Kelly admitted that he did not sign an agreement on January 10, 2008 as alleged in Mezzo's complaint or on January 16, 2008, the date written in next to Kelly's signature. Instead, Kelly admitted that he "backdated" the agreement to "clean up" his mistake and make it appear that the agreement was signed by the parties on January 10, 2008. (134: 5-11, 136:1-17, 128:9-22, Ex. D-28)

35.     Kelly also admitted that he was maddened by his own failure to sign the non-disclosure agreement in a timely manner. (136:1-17)

36.     Despite this clear and uncontroverted knowledge of Kelly to the contrary, Mezzo seeks to enforce this version of the agreement. (P-7)

37.     The document that Mezzo asserts is "the" agreement between the parties has a January 10, 2008 date for the Defendants' signature and a January 16, 2008 date for Mezzo's signature. (Ex. P-7)

38.     Kelly admitted that as of April 2008, the only copy of the agreement Mezzo had with a signature by the Defendants was the faxed copy containing Wood's insurance information on the first page.

39.     The agreement that Mezzo seeks to enforce (Ex. P-7) contains several distinguishing characteristics:  (a) Wood's signature matches the signature that he placed on the January 10, 2008 faxed document; (b)  the agreement contains three-hole punch marks on the left margin; and (c)  the agreement does not have Wood's insurance card on the first page.

40.     On October 6, 2008, Wood sent to Mezzo a clean copy of the agreement he had previously signed on January 10, 2008 and faxed to Mezzo.    But, because Wood took the agreement from his binder, the copy he sent on that date had (a) no insurance card on the first page and (b) had three hole punch marks. (400: 21-24)

41.     The three hole punch marks on the agreement that Mezzo seeks to enforce (Ex. P-7), which were not on the document that Wood sent on January 10, 2008, match the three hole punch marks on the agreement that Wood sent to Kelly on October 6, 2008.  (399:12-25, 400: 1-25, Ex. P-45)

42.     Although Mezzo bears the burden of proving a non-disclosure agreement existed between the parties and seeks to enforce a specific agreement (Ex. P-7), Mezzo did not offer any proof at trial to show its existence, including when Kelly purported to sign the non-disclosure agreement or when Mezzo notified the Defendants that the non-disclosure agreement was actually in effect.[2]

---

[2] During the trial, the Court questioned the lack of evidence supporting Mezzo's claim that the NDA was actually in effect.  (*See* 552:3-9)

43.     Likewise, Mezzo did not offer any evidence to prove the existence of an oral non-disclosure agreement;  the only evidence related to this allegation was that Defendants believed <u>no</u> oral agreement existed.  (434:6)[3]

### *Frontline provides Specifications for the Recuperator and pays Mezzo $5,000*

44.     Because Mezzo had no familiarity with the Rolls Model 250 engine or configuring a recuperator for use with it,  Wood provided a number of specifications about the engine to Mezzo.   (52: 9-11, 87:2, 411:4-10)

45.     In addition, Wood obtained and provided to Mezzo an actual exhaust duct taken from a Rolls Royce Model 250 engine so that Mezzo could understand the shape and size required for the recuperator. (409:7-12, 411:2-4)

46.     Mezzo required that Frontline pay $5,000 before Mezzo would perform any work.  Frontline paid Mezzo the required $5,000.  (412:7)

47.     Mezzo never informed the Defendants in writing or orally that the $5,000 amount was simply reimbursement of Mezzo's time in preparing written reports. (412:15-19)

48.     Just the opposite, in a March 6, 2008 email, Kelly acknowledged that Mezzo accepted the $5,000 in exchange for a "very light weight, good concept that you

---

[3] Mezzo does not allege the existence of an *oral* non-disclosure agreement in its Complaint, and instead, contends the agreement is a written agreement between the parties. *See* Complaint Paragraph 13-14.  Despite this allegation and faced with the absence of proof to show that this alleged written agreement came in to existence between the parties, Mezzo shifted its story at trial and suggested that an oral agreement formed the basis of its claims.

[Wood] can use to help sell the V-Star program to funding agencies such as DARPA." (416:21-24, and Ex. D-28)

49.    The "concept" that Mezzo referred to in its email and for which the $5,000 payment was made, included the right to use drawings contained in the reports furnished to the Defendants by Mezzo. (417: 18-20) Mezzo never informed the Defendants that the $5,000 was to simply be a reimbursement for time spent by Mezzo or Kelly. (412:21)

50.    Later on, in an August 20, 2010 email to Triumph Thermal Systems, Kelly again confirmed that Mezzo charged the Defendants $5,000 for use of a design concept and not simply for Mezzo's time in preparing the Preliminary Report and Quotation. (192:12-25)

51.    Kelly also stated that he believed that the design he provided to Wood (and which is referred to in the August 20, 2010 email) was covered by another pending patent application. (192:15)

### *The February 2008 Design Report and April 2008 Quotation*

52.    After the Defendants paid Mezzo $5,000, Mezzo provided the Defendants with two written reports: the February 2008 Preliminary Design Report and the April 2008 Quotation (98:7-9 and Ex. P-26)(108:7-9)

53.    According to Kelly he wrote the February 2008 Preliminary Design Report and April 2008 Quotation (99:6, 108:10). Kelly also admitted that he conceived of all aspects of the February 2008 Preliminary Design Report and April 2008 Quotation documents. (176:12-16)

54.     Among other components, the February 2008 Preliminary Design Report and April 2008 Quotation contained schematic drawings of recuperators.

55.     The Defendants understood that they, through the payment of $5,000 to Mezzo, purchased these drawings and were entitled to use them.  (412:8-14)

### *Mezzo's Alleged Trade Secrets*

56.     In its complaint, Mezzo alleges that the Defendants took Mezzo's trade secrets, however.  Mezzo did not describe specifically its alleged trade secrets in the complaint.

57.     During the trial, Kelly asserted that (a) the Defendants took Mezzo's trade secrets; (b) Mezzo's trade secrets were important to the company; and (c) that he could identify Mezzo's trade secrets.  (152:19-25)

58.     In response to questions about *which* Mezzo trade secrets formed the basis of Mezzo's claims, Mezzo identified six specific items:  (a) procedures to epoxy/braise tubes to headers and mid-plates; (b) procedures to cut and debur tubes; (c) best practices to make headers and mid-plates; (d) heat transfer models based on heat transfer tests of microtube heat exchangers for a wide variety of cases; (e) best sources of materials; and (f) unique designs associated with microtubes to reduce stresses in the outermost tubes.  (155-160)

59.     Kelly admitted that neither he or anyone at Mezzo provided <u>any</u> of these six alleged trade secrets to the Defendants.  (155-160)

60.      Kelly also admitted that none of these six alleged trade secrets were disclosed or even discussed in the '031 Patent. (155-160)

61.     Likewise, Kelly admitted that Wood's patent application does not include any calculations, stating that Wood didn't "include in his patent application…the calculations that make this worth going after in the first place…."  (117:18-20)

62.     Kelly also admitted that other items related to recuperators which Mezzo apparently considered trade secrets (*e.g*., data logs, pressure drops, heat transfer calculations, tube correlations and size of tubes) were not disclosed to the Defendants.  (161:18, 162:15, 162:21, 163:3-5, 115:3-13)

63.     Kelly also acknowledged that the corrugated design for a recuperator was not a Mezzo trade secret and he was not the inventor of the corrugated design. (164:21, 166:16-17, 170:3-5)

64.     Similarly, Kelly acknowledged that the annular  design for a recuperator was not a Mezzo trade secret and that it was simply a trivial and obvious deviation of the plain corrugated design (which Kelly confirmed was not listed as a Mezzo trade secret). (166:1-5)

65.     The Defendants' expert, Dr. Satish Kandlikar,  testified that recuperators in annular designs were well-known and available in published papers.   (501:17-24)

66.     In fact, the corrugated design for a recuperator could not be a Mezzo trade secret or proprietary because it was publicly disclosed and discussed in a 2006 paper published by Kevin Kelly himself.  (170:6-8, 17-18. and Ex. D-55)

67.     Dr. Kandlikar confirmed that the corrugated design was disclosed in the open literature, including Kelly's 2006 paper. (510:8)

68.     Kelly also admitted that neither he or Mezzo came up with the concept of making a recuperator in an annular configuration and that other companies were producing annular shaped recuperators.  (177:23-25 178:1-6)

69.     Other than the items identified above, Mezzo did not identify <u>any</u> specific trade secrets which the Defendants allegedly misappropriated and that form the basis of its claims.[4]

### *The '031 Patent and Ryan Wood as the Inventor*

70.     On August 17, 2010, the United States Patent Office issued Patent No. 7,775,031 which claims "Recuperator for Aircraft Turbine Engines" (the "'031 Patent") (Ex D-58)

71.     The named inventor on the '031 Patent is Defendant Ryan Wood. (Ex D-58)

72.      The '031 Patent does not claim a recuperator or gas turbine engine. Instead, the patent claims the combination of a gas turbine engine with a microtube recuperator. (Ex D-58, Claims 1-16)

73.     In contrast to the combination of an engine and a recuperator which is what is claimed in the '031 Patent, Dr. Kandlikar confirmed that the individual elements

---

[4] Mezzo referred generally to other alleged trade secrets, but did not present <u>any</u> evidence that these trade secrets were actually disclosed to the Defendants or formed the basis of Mezzo's claims.  *See* 99:11-12 (Mezzo model), 101:7-12 (description of tube sizing, heat transfer correlations), *but see* 161:18, 162:15, 162:21, 163:3-5; 121:10-24 (acknowledging these items were not provided to Defendants).  Mezzo also referred to the entire "design" of a recuperator being a trade secret, but as discussed below, as a matter of law, a vague allegation like this is not sufficient to support a trade secret claim.  The sum total of Mezzo's allegations and evidentiary showing is that it did not prove the existence of any Mezzo trade secrets that were provided to the Defendants or which were disclosed in the '031 Patent.

such as a recuperator, the notion of using microtubes of certain thicknesses, the use of a recuperator in a corrugated shape, along with each of the other individual elements discussed in each of the claims in the '031 Patent are widely known and found in the open literature.  (522:13-14, 525:4-5, 525:8-11, 525:18-21, 526:5-8, 526: 19, 527:19-20, 529)

### *Mezzo as the Alleged Inventor of the '031 Patent*

74.     In its complaint, Mezzo alleged that it was the "sole" inventor of the application that lead to the '031 Patent.  Mezzo did not allege that Kevin Kelly or any other person was the inventor of what was claimed.  Related to these allegations, Mezzo asks the Court to declare that Mezzo is the "sole inventor of the '031 Patent (at the time of filing, simply an application). (Complaint 70(a))

75.     At trial, Mezzo's counsel changed its story and claims, asserting first that Becnel and McClean, and later, that only Kelly was the sole inventor of what was claimed in the '031 Patent.  (304:3-8, 658:2-3)

76.     Other than statements made by Mezzo's counsel in argument, Mezzo offered no evidence to show that Kelly (or anyone else) was the inventor of what is claimed in the '031 Patent.  Mezzo offered no corroborating evidence, such as lab notebooks or contemporaneous to show who, other than Wood, invented what is claimed in the '031 Patent. [5]

---

[5] The Court raised this specific issue, in the context of the allegation that Mezzo should be listed as the inventor on the '031 Patent instead of Wood.  After questioning by the Court, Mezzo's response (in argument, and not through testimony) was that Kevin Kelly should be listed as the inventor, after first urging that others were also inventors. (*See* 658: 2-3).   Mezzo introduced <u>no</u> competent

77.     Mezzo offered no analysis or evidence of any claim in the '031 Patent to prove

that Kelly or anyone else is the inventor of each and every element of the claims in

that patent.

78.     Just the opposite, Kelly admitted that neither he or Mezzo invented or

conceived the concept of combining a microtube recuperator with a Rolls Royce 250

Model gas turbine engine, which is what is claimed in the '031 Patent.  (178:1-4)

### *Kevin Kelly's Status as Employee of LSU*

79.      In 1993, Kelly started work as an employee of LSU, eventually working as

an Assistant Professor of Mechanical Engineering.  (27:17-19, 28:9-10)

80.     In 2000, while still working at LSU, Kelly formed and started work at Mezzo.

(28:12)

81.     During this time period, Kelly was heavily involved in the work at Mezzo at

the same time he worked for LSU.  In fact, Mezzo was located on the LSU campus,

allowing Kelly to easily walk from his job as an engineering professor to perform

work at the Mezzo offices. (37:1-5)

82.     Much of Mezzo's work and research was based on research that Kelly and his

LSU research assistants performed through his employment at LSU.  (37:9-12)

83.     During the time when Kelly was working at both LSU and Mezzo, Kelly

conceived of certain concepts or ideas that he reported to LSU's Intellectual

Property Office.  (37:6-9)

---

evidence to show that Kelly himself invented anything claimed in the '031 Patent.
Moreover, Kelly is not a party to this action.

84.     Chapter 7 of the LSU Bylaws provides that <u>all</u> inventions conceived of by LSU employees such as Kelly, regardless of where or when the invention occurs, is considered the intellectual property of LSU.  (113:10 and Ex. D-33).  In addition, all employees are required to execute documents confirming LSU's ownership.   (Ex D-33 (Section 7-3))

85.     Similarly, Permanent Memorandum No. 16 ("PM-16") requires that if LSU employees conceive of inventions that they believe are protectable and/or patentable, the employees are required to disclose that information to LSU. (333:19-25, Ex. D-35)

86.      Additionally, Permanent Memorandum No. 11 ("PM-11") requires that before LSU employees accept outside employment (such as Kelly's employment at Mezzo), the employee notify and obtain approval from LSU.  (331:7, Ex. D-34)

87.     Sometime in 2006, while Kelly was still employed at LSU, Mezzo and Kelly (working at Mezzo) started work on microtubes and heat exchangers using those tubes.  (32:11:14)

88.     Kelly took a leave of absence from his duties at LSU in 2007. (38:17)

89.     On November 1, 2007, Kelly wrote a letter to LSU stating that he would resign from the university, effective May 10, 2008.  (137:11-16, Ex. D-39)

90.     Kelly delayed his resignation until this date because he wanted to continue to work with LSU's "Mini-Baja" team, a team of LSU students who competed in an annual off-road competition for college students.  Kelly admitted that LSU policy

permitted only full-time "official" employees to travel with the team, so he delayed the resignation until after the competition. (38:17)

91.     Consistent with Kelly's statements in his resignation letter, LSU's Human Resources records show that Kelly's date of separation, *i.e.*, the date he was last employed at LSU, was May 10, 2008.  (359:24, Ex. D-37, Item 3)

Although Kelly contends he was no longer employed by LSU after his letter on November 1, 2007, Kelly executed at least two documents that show otherwise:

(a)     On November 29, 2007, Kelly signed an employment agreement with Mezzo which declares that he was employee of LSU at the time he signed the agreement.  (140:5-7, Ex. D-39.1).   The employment agreement specifically refers to Kelly's obligations as an employee of LSU under PM-11 and states that any inventions developed by Kelly would belong to LSU, not to Mezzo or Kelly.  (Ex. D-39.1)

(b)     On February 28, 2008, *after* he sent his November 1, 2007 resignation letter and *after* the date which Kelly claims he was no longer an employee of LSU, Kelly signed a required PM-11 disclosure form.  (147:3-7, Ex D-43)   PM-11 requires that all LSU employees complete the form related to outside employment.   In that form, Kelly signed as an LSU employee

and stated that he was an Associate Professor of Mechanical Engineering.[6]

92.    When Wood first contacted Kelly (in January 2008) and when Mezzo sent Wood the February 2008 Preliminary Design Report and April 2008 Quotation, Kelly was still an LSU employee.  As such, Kelly was subject to LSU's policies concerning the ownership of any inventions conceived of by LSU employees.[7]

### *Mezzo's Dealings with Triumph Thermal Systems*

93.    After Mezzo provided the February 2008 Preliminary Design Report and April 2008 Quotation, the Defendants continued to pursue a relationship with Mezzo during the Spring and Summer of 2008, attempting to reach Mezzo by phone and email.  (430:20-25)

94.    Initially, Mezzo refused to respond to the Defendants' attempts to make contact.  (431:19)

95.    Eventually, Kelly responded, but told Wood that he would not sign any type of agreement because he was "in the process of discussing a…license with [a] very

---

[6] Kelly testified that he could have refused to sign the form, but chose to do so voluntarily.  (143:23-24, 144, 7)  Kelly also stated that while he regarded the document as irrelevant, he signed it anyway.  (143:13-15).  Kelly said he sometimes signed documents that are irrelevant. (143:16-19).

[7] Defendants do not suggest or contend that LSU is actually the owner or inventor of the technology at issue here.  However, to the extent that the Court believes that Mezzo proved that Kelly is the inventor (the contention made by Mezzo at trial) instead of Ryan Wood, the evidence shows that Kelly was an employee of LSU at all relevant times.  Consequently, Mezzo lacks standing to assert its claims because any rights to the invention claimed in the '031 Patent, to the extent they do not belong to Wood, cannot belong to Mezzo or Kelly individually.

large company, Triumph Thermal" and that Mezzo couldn't be "encumbered" with agreements with other parties. (204:12-18)

96.    On September 18, 2008, unknown to the Defendants, Kelly, on behalf of Mezzo, signed an exclusive license agreement with Triumph Thermal Systems ("Triumph"). (181:11, Ex. D-63, 182:2)

97.    In general terms, the September 18, 2008 license exclusively licensed to Triumph (and Triumph alone) the rights to use certain Mezzo technology, defined as the "Licensed Technology." (Ex. D-63)

98.    According to Kelly, however, the "Licensed Technology" as defined in the agreement, overlapped with the technology covered by the '031 Patent and for which Wood, and not Mezzo or Kelly, is listed as the inventor. (184:7-11)

99.    Despite the admitted overlap, Mezzo represented and warranted to Triumph in the agreement that there were no other licenses or agreements, whether oral or written, relating to the Licensed Technology. (185:1-6, Ex. D-63). In particular, Mezzo did not disclose to Triumph the alleged existence of the non-disclosure agreement that Mezzo seeks to enforce here or the arrangement through which it sold the Defendants the design concepts for $5,000. (190:16-18)

100.    Yet, Kelly now contends that, when he signed the agreement with Triumph, the September 18, 2008 License Agreement, there was a valid non-disclosure agreement in place between Mezzo and the Defendants. (185:10)[8]

---

[8] As the Court will recall, Mezzo took the "wishy-washy" position that the non-disclosure agreement at issue here, is somehow enforceable against the

101. Mezzo also represented and warranted in the September 18, 2008 License Agreement that there were <u>no</u> other claims, demands, suits, or proceedings of any types, pending or threatened, related to the Licensed Technology.

102. Shortly after signing the License Agreement, however, Mezzo's counsel wrote to the Defendants, without telling Triumph, and threated to sue the Defendants for stealing Mezzo's intellectual property and trade secrets. (191:10-14)

103. Mezzo and Kelly *never* told Triumph about Wood, the '031 Patent, the alleged non-disclosure agreement or any of the other claims asserted against Defendants until Mezzo sent an email on August 20, 2010, more than two months <u>after</u> Mezzo filed its complaint. (198:5-8)

104. In the August 20th email to Triumph, Mezzo admitted to Triumph that it had filed suit against the Defendants, that Mezzo now (despite the contrary representations and warranties in the Triumph Agreement) took the position that the non-disclosure agreement with the Defendants actually existed, and that Ryan Wood has claims to concepts that Mezzo licensed to Triumph. (190:25, 192)

105. Mezzo also admitted in the August 20th email that it sold the Defendants the design concept for $5,000. (192:15) The email does not say, however, that Mezzo charged Wood $5,000 simply for Mezzo or Kelly's time in preparing the reports. (192:25)

---

Defendants, but, at the same time was not an "agreement" as that term was used in

### *The Missing Mezzo-Triumph Email(s)*

106. On September 28, 2011, the Court ordered Mezzo to produce certain records related to Mezzo's dealings with Triumph. Rec. Doc. No. 109.

107. The Court ordered Mezzo to produce all documents, including emails, received from or sent to Triumph related to the '031 Patent. Rec. Doc. No. 109, p. 7.

108. Kelly admitted that he sent an email to Triumph on the morning of his deposition (May 2010) concerning the '031 Patent. (187:25, 188:1)

109. And although Kelly was involved in gathering and producing Mezzo documents in response to the Court's order, Kelly admitted that Mezzo did not produce any documents sent to Triumph on the morning of Kelly's deposition, including the email he admitted to have sent.

### *Mezzo's Alleged Damages*

110. Mezzo did not introduce competent evidence to show it suffered economic loss or damages caused by the Defendants' alleged conduct.

111. Likewise, Mezzo did not introduce evidence that the Defendants have gained any revenue, income or compensation of any type derived from Mezzo's alleged trade secrets and/or patent rights.

112. The only evidence offered was Kevin Kelly's unsupported statement that Mezzo allegedly suffered $250,000 in damages. (126: 23). Kelly admitted, however, that the number was not based on any analysis, written or otherwise, of Mezzo's alleged damages. (126:20-21). Moreover, Mezzo did not identify any specific

the representations made by Mezzo to Triumph. (203: 22-23)

categories that backed up Kelly's unsupported statement, such as lost business

revenue, licensing revenue, etc.[9]

### *Mezzo's Unfair Trade Practices and the Defendants' Damages*

113.    Mezzo's threats and attempts to enforce the alleged non-disclosure agreement

between Mezzo and the Defendants, which the evidence shows was not enforceable,

caused harm to Frontline's business.  (439:1-4, 440:20)

114.    Frontline's business plan was aimed at raising $5,000,000 in capital

investments. (440:9-15)

115.    Mezzo's actions caused Frontline to divert resources and money and

hampered its ability to raise capital consistent with its business plan.  (430:9-12, 15,

439: 5-12)

116.    Mezzo's actions also caused potential investors to <u>not</u> invest in Frontline.

Those investors included The Phoenix Group, Third Coast Capital, and Warburg

Capital Group.  (446: 7-18)

---

[9] Kelly blurted out his damage figure in response to a series of cross examination questions.  (126:23)  Tellingly, Mezzo offered no specific damages evidence through Kelly's direct examination.  The Court then questioned Mezzo's counsel regarding the lack of evidence of economic loss and/or damages.  (572: 13-19, 572: 23-25, 573: 5-9)  Mezzo's counsel was unable to identify any specific evidence to support Mezzo's claims.  (570: 12-13)

## PROPOSED CONCLUSIONS OF LAW

In its complaint, Mezzo alleges claims asserting that defendants (1) breached a confidentiality agreement, (2) committed fraud in the inducement of the alleged agreement, (3) negligently misrepresented what it promised under the alleged agreement, (4) tortiously interfered with the alleged agreement's performance, and (5) committed civil conspiracy with the object of breaching the alleged agreement. Mezzo further asserted that Wood was (6) unjustly enriched by "enjoy[ing] the benefits of Mezzo's confidential information without incurring the costs to develop the information."[10]    Mezzo next asserted Wood (7) misappropriated its trade secret information, the secrecy of which Mezzo allegedly took measures to maintain by "using non-disclosure agreements, locked facilities, and computer passwords."[11] Finally, Mezzo complained that Wood engaged in (8) "misappropriation of [Mezzo's] patent rights" by, among other things, including figures in his patent application that were allegedly protected from public disclosure under the confidentiality agreement.

### *Claims related to Application and '031 Patent*

Mezzo has asserted that it is the sole inventor of U.S. Patent Application Serial Number 12/116,536 which issued as the '031 Patent.  Mezzo asks the Court to declare Mezzo to be the sole inventor and declare that Mezzo is the owner of the

---

[10] Rec. Doc. No. 1, Paragraph 30.

[11] *Id.*, at Paragraph 49.

'031 Patent.[12]  Mezzo has also alleged that the Defendants misappropriated patent rights.  While there are no clear causes of action provided under the patent statutes to support this allegation, it appears to grow out of the basic allegation that Mezzo is the true inventor and owner of the '031 Patent.  In order to address Mezzo's claims, some basic understanding of the patent statutes is necessary.

The Patent Act provides for the exclusive establishment, under Federal law, of patent rights.  35 U.S.C. §101 discusses who can make an application for a patent.  It provides, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, *or any new and useful improvement thereof*, may obtain a patent therefor, subject to the conditions and requirements of this title." [*emphasis added*]

The Patent Act requires inventors to disclose information about their inventions.  This disclosure is distinguished from the claims of a patent.  35 U.S.C. §112, first paragraph, provides as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

---

[12] At the time when Mezzo filed its complaint, the '031 Patent had not yet issued.

The written description of a patent is distinguished from the claims of the patent. 35 U.S.C. §112 also addresses, in its second paragraph, the requirement to include one or more claims at the end of the specification:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Thus, the claims define the <u>inventor's</u> patent rights. The written description is not limited to subject matter invented by the inventor. The only requirement of the written description is that it provide enough detailed information to enable those skilled in the art to make and use the invention, <u>and</u> to disclose the best mode to carry out the invention.

The '031 Patent covers an improvement to the Rolls Royce 250 family of externally ducted turbine engines by combining the claimed recuperator elements with the claimed elements of this type of engine. It is important to note that Wood did not receive a patent on the recuperator itself.

Each claim of the '031 Patent is directed to a *combination* of the structure of an externally ducted engine with a specific type of recuperator. Wood testified that he does not claim to have invented the recuperator itself. It is interesting to note here that Mezzo did, at the very time it was dealing with Wood and Frontline, indeed file its own patent application covering a heat exchanger using a corrugated wall of microtubes. This application has not issued into a patent. Mezzo licensed any rights it might obtain in this application exclusively to Triumph. Each claim of

the '031 Patent very clearly includes elements addressing the particular externally-ducted turbine (with claims 13-16 being directed to the exact model of externally-ducted turbine) that was key to Wood's claimed combination.

No claim in the '031 Patent claims *only* the recuperator. It was Wood who decided to use the claimed recuperator elements (invented by someone else) in the externally-ducted turbine (also created by someone else). Kelly testified that he did not know anything about the Rolls Royce engine before he talked to Wood.

The sole basis under the Patent Act for correcting inventorship of a patent is 35 U.S.C. §256, which provides as follows:

§ 256. Correction of named inventor

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issued a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

Thus, Mezzo must assert its claims related to inventorship, to the extent they can even be brought, within the confines of 35 U.S.C. §256.

Mezzo has urged in its complaint that it, Mezzo, be named the sole inventor of U.S. Patent Application No. 12/116,536, which has since matured into the '031 Patent." Under U.S. patent law, juridical persons can "never [be] declared an

'inventor'" because "only natural persons can be 'inventors.'"[13] Mezzo, a Louisiana corporation, *i.e.,* a juridical person,[14] therefore lacks the legal capacity to be an "inventor" of a U.S. Patent. Mezzo is the only party plaintiff to this litigation.

Even if the Court interprets Mezzo's pleadings to allege that the '031 Patent should be corrected to include an unnamed natural person other than Wood, Mezzo must have standing to assert its claims. The Federal Circuit has required that a plaintiff suing for correction of inventorship under § 256 show, at a minimum, a "concrete financial interest" in the outcome of the inventorship dispute.[15]

Furthermore, assuming standing exists, subject matter jurisdiction under § 256 does not exists unless all alleged inventors have been given notice and an opportunity to be heard.[16] At trial, it was first urged by Mezzo's counsel that Kelly and/or Becnel and Mclean are the inventors of the '031 Patent. Later, the Plaintiff's

---

[13] *Beech Aircraft Corp. v. Edo Corp.*, 990 F. 2d 1237, 1248 (Fed. Cir. 1993) (citing 35 U.S.C. §§ 115-118).

[14] La. Civ. Code. art. 24 ("A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership.").

[15] Compare *Larson v. Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009) (finding no standing exists between a co-inventor requesting correction of a patent to name him as the sole inventor and his former employer because he had assigned all his rights in the invention to the defendant) with *Chou v. Univ. of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001) (finding standing between an alleged co-inventor requesting that a patent additionally name her as an inventor and her former university because, although she had assigned all her rights to defendant, under the assignment agreement, if she was listed as an inventor then she would be entitled to royalties from licensing revenue and equity in start-up companies using the patent).

[16] *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir. 1989).

position changed to urge that only Kelly is the true inventor.  Neither Kelly, nor

McClean, nor Becnel are parties to this action.  Becnel and Mclean did not testify.

Testimony and exhibits established that when Mezzo provided the February

2008 Preliminary Design Report and April 2008 Quotation to the Defendants, Kelly

was an employee of LSU and therefore any intellectual property created by Kelly

was owned by LSU.   Therefore, Mezzo cannot have had a "concrete financial

interest" in Kelly's activities.  Mezzo does not have standing to seek correction of

inventorship.

If Mezzo instead relies on the alleged assignment obligations of Becnel and

Mclean, then the requirements of § 256 have not been met because they have not

been given notice or opportunity to be heard by this Court. As the Federal Circuit

stated in *MCV, Inc. v. King-Seeley Thermos Co.*:[17]

> The statute prescribes only one prerequisite to judicial action: all
> parties must be given notice and an opportunity to be heard. If that is
> done, there is subject matter jurisdiction in the district court over a
> dispute raising solely a joint inventorship issue among contending co-
> inventors.

Hence, the absence of Mezzo's other employees likewise proves fatal to its claim

under § 256.

Assuming Mezzo has standing to seek correction of the '031 Patent on Kelly's

behalf, 35 U.S.C. § 256 creates a cause of action to determine the correct

---

[17] *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir.
1989).

inventorship of the patent.[18]  Section 256 permits a court to order correction when "an inventor is not named in an issued patent and such error arose without any deceptive intentions on his part."[19]  Because no party alleges that Kelly had a deceptive intent in not being named as the inventor of the '031 Patent, the only issue before the Court is whether Mezzo, on behalf of Kelly, has met its burden of proving that Kelly is the inventor.

Those who are already named as inventors on the patent enjoy a presumption that they are the "true and only inventors."[20]  Those not so named, by contrast, have the burden of proving their contribution was inventive by clear and convincing evidence.[21]

"To meet the burden of clear and convincing evidence, the alleged co-inventors must prove their contribution to the conception of the invention with more than their own testimony concerning the relevant facts." [22]  An alleged inventor

---

[18] *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1471 (Fed.Cir.1997).

[19] 35 U.S.C. § 256; see *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1555 (Fed. Cir. 1997) ("[T]he statute allows correction in all misjoinder cases featuring an error and in those nonjoinder cases where the unnamed inventor is free of deceptive intent.").

[20] *Gemstar-TV Guide v. Int'l Trade Com'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004) (citing *Hess v. Adv. Cardiovascular Systems, Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)).

[21] *Gemstar-TV Guide v. Int'l Trade Com'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004) (citing *Ethicon, Inc. v. United States Surgical Corp.*, 135 F. 3d 1456, 1461 (Fed. Cir. 1998)).

[22] *Gemstar-TV Guide v. Int'l Trade Com'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004) (citing *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002)).

cannot establish his inventive contribution with merely his own uncorroborated testimony because such evidence, standing alone, is not sufficient to rise to the level of clear and convincing proof. [23]

"It is a bedrock principle of patent law that the claims of a patent define the invention,"[24] and "each claim must be considered as defining a separate invention."[25] Hence, inventorship is determined on a claim-by-claim basis.[26] Likewise, features that are disclosed in the specification and drawings are relevant to the inventorship analysis *only* to the extent they bear on limitations found in the claims.[27] Therefore, as with "an infringement or invalidity analysis," an inventorship analysis first requires that the Court "constru[es] each disputed claim to determine the subject matter encompassed thereby" and then "compar[es] the alleged contributions of each asserted co-inventor with the subject matter of the correctly construed claim."[28]

---

[23] *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) ("[T]he case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof.").

[24] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

[25] *Jones v. Hardy*, 727 F. 2d 1524, 1528 (Fed. Cir. 1984).

[26] *Gemstar-TV Guide v. Int'l Trade Com'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).

[27] See, e.g., *Ethicon, Inc. v. United States Surgical Corp.*, 135 F. 3d 1456, 1461-62 (Fed. Cir. 1998)(emphasis added)(discussing features disclosed in patent figures in the context of the required limitations of the patent claims).

[28] *Gemstar-TV Guide v. Int'l Trade Com'n*, 383 F.3d 1352, 1381-82 (Fed. Cir. 2004) (citing *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002).

Next, the Court considers facts relevant to conception, "for others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law."[29] The Federal Circuit has emphasized the importance of conception in determining whether a person is a true inventor:

> Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention. Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice. Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation. [30]

Although an alleged inventor's required showing begins with conception, it does not end there. The "basic exercise of ordinary skill in the art, without an inventive act, does not make one a joint inventor."[31] The alleged inventor must further "show he made a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art."[32]

---

[29] *CR Bard, Inc. v. M3 Systems, Inc.*, 157 F. 3d 1340, 1352 (Fed. Cir. 1998).

[30] *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citations and quotations omitted).

[31] *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citing *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997)).

[32] *Acromed Corp v. Sofamor Danek*, 253 F.3d 1371, 1381 (Fed. Cir., 2001) (internal quotes omitted, alteration in original) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)).

Regarding the combination of elements found in the prior art, the Federal Circuit has long established that "virtually all inventions are combinations of old elements,"[33] and "'[c]ombination claims can consist of new combinations of old elements . . . for it may be that the combination of the old elements is novel and patentable."[34]

Mezzo offered no evidence to corroborate Kelly's testimony that he made an inventive contribution to the '031 Patent. An alleged inventor's uncorroborated testimony is insufficient to rise to the level of clear and convincing proof needed to establish his status as an inventor. Mezzo's inventorship claim fails on this basis alone.[35]

This is not the only measure by which Mezzo's evidence was lacking. Mezzo offered no proposed claim construction nor any element-by-element analysis as required under § 256. Before the Court may reach the issue of conception, it must first determine what the claims encompass. Only by first parsing each claim into its elements, can the alleged inventor then relate his alleged contribution to the patent at issue. Mezzo failed to put on *any* evidence relating to the actual language found in the claims of the '031 Patent. Mezzo's inventorship claim fails because Mezzo

---

[33] *In re Rouffet*, 149 F.3d 1350, 1358 (Fed. Cir., 1998).

[34] *Acromed Corp v. Sofamor Danek*, 253 F.3d 1371, 1381 (Fed. Cir., 2001) (quoting *Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1444 (Fed. Cir. 2000)).

[35] *Price v. Symsek*, *supra*, 988 F.2d at 1194.

did not offer evidence as to inventorship of *each* element of *each* claim of the '031 Patent.

Finally, even when the Court attempts to define the invention, the basic idea behind the '031 Patent is the combination of a previously designed heat exchanger with a previously designed externally ducted turbine engine. Kelly admitted that neither he nor anyone at Mezzo had considered using a recuperator with a Rolls Royce 250 engine.

In fact, Wood testified that he sent an actual exhaust duct to Kelly to explain the engine and illustrate Wood's desired result.  Further, Kelly himself testified, "I look at the annular corrugated design as a trivial - - what's the word I'm looking for - - it's a deviation, an obvious deviation of the plain or corrugated design that we were already building products out of . . ."  Thus Kelly has himself, while not addressing specific claim elements at all, negating his alleged contributions to the invention.

Ryan Wood is listed as, and is legally presumed to be, the sole inventor of the '031 Patent.  Mezzo cannot be an inventor of the '031 Patent, and has not made the required nexus to represent the interests of any other alleged inventors.  Mezzo has mentioned at least three possible alleged inventors, none of whom are parties to this litigation, and two of whom did not testify in this matter.  Thus, all alleged inventors have not been heard by this Court.  Therefore, Mezzo has no standing to assert its claims of inventorship.

Alternatively, Mezzo has presented little, if any, evidence establishing its premise that Kelly, or anyone else, is the inventor of each and every element of the claims of the '031 Patent. Thus, Mezzo has not shown by clear and convincing evidence that any other person is an inventor of the '031 Patent. The inventorship analysis begins and ends with a patent's claims. Mezzo has already been paid $5,000 for its designs. It is entitled to nothing more.

With regard to Mezzo's claim for misappropriation of patent rights, Mezzo has provided no basis for this cause of action. At least one court has held that, if a State law claim could be based on conversion or misappropriation of patent rights, it would be preempted by federal law.[36]

To the extent that Mezzo claims that the Defendants' activities deprived it of patent rights, such rights may only be granted upon application to the U.S. Patent and Trademark Office. Such a claim is speculative at best and, ultimately, baseless because Mezzo is currently the assignee of a pending U.S. Patent Application which it filed at the same time it was working with the Defendants. Mezzo's president, Kelly, testified, ". . . I did agree to come up with a concept by, based on microtubes that was protected by a patent application. I charged him $5,000 for the design concept." (192:13-16)

By this testimony, Kelly established that he believed the design concept was covered by the Mezzo patent application. Mezzo cannot claim that patent rights

---

[36] *The Informatic Applications Group, Inc. v. Shkolnikov*, 2011 WL 6779304, slip op. at *16 (E.D.Va. Dec. 27, 2011) (citing *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997)).

were misappropriated when Mezzo believed that the design which is the basis of this lawsuit was covered by an existing Mezzo patent application. To the extent that there is a cause of action for misappropriation of patent rights, Mezzo has not met its burden of proof and is entitled to no relief.

## Breach of Contract

Under Louisiana law, the party claiming a breach of a contract first bears the burden of proving the existence of the contract between himself and his opponent.[37] Article 1927 of the Louisiana Civil Code provides that "[a] contract is formed by the consent of the parties established through offer and acceptance." Once an offer is made, the contract is not perfected until the offeree transmits his acceptance to the offeror.[38]

To constitute an offer, the communication must reflect the intent to give the other party the right of concluding the contract by assent. Where this assent is not present, the proposal cannot be considered an offer, but rather an invitation to negotiate or an expression of willingness to receive offers from others.[39]

---

[37] *Pennington Construction, Inc. v. RA Eagle Corp.*, 652 So.2d 637, 639 (La. App. 1 Cir. 3/3/95) (citing La. Civ. Code art. 1831).

[38] La. Civ. Code art. 1935.

[39] La. Civ. Code Art. 1803, 1813. *See also* 1 S. Litvinoff, La. Civil Law Treatise, Obligations, § 130 (1969); *Foster v. Tullos*, 341 So.2d 85 (La. App. 3 Cir.1976); *Eames v. James*, 452 So. 2d 384, 386 (La. App. 3 Cir. 1984).

The offeree does not have an unlimited time to accept an offer; he must communicate his acceptance within a reasonable time.[40] Whether an acceptance was communicated within a "reasonable time" depends "more or less upon the circumstances surrounding each particular case" and the "evident intention of the parties."[41] An acceptance that is timely transmitted but varies from the terms of the offer, is not an acceptance; it is a counteroffer.[42] A counteroffer acts to negate the original offer.[43]

Here, Mezzo alleges that a non-disclosure agreement existed between the parties and that the defendants breached that agreement. As the party making this claim, Mezzo bears the burden of proving the existence of the non-disclosure agreement, including proving "offer" and "acceptance." Mezzo has not met its burden and has not established that a valid agreement exists.

Despite Mezzo's contention, Kevin Kelly's January 10, 2008 email and the attached document did not constitute an offer. Although styled as a non-disclosure agreement, the document forwarded by Kelly was simply a generic, incomplete,

---

[40] La. Civ. Code art. 1931.

[41] *Ever-Tite Roofing Corporation v. Green*, 83 So. 2d 449, 452 (La. App. 2 Cir. 1955); see Saúl Litvinoff, *Consent Revisited: Offer, Acceptance, Option, Right of First Refusal, and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 La. L. Rev. 699, 712-13 (1987) (noting illustrative factors for determining the reasonable time within which an offeree may accept an offer, including: the speed of the mode of communication between the parties, the nature of the contract, and the sophistication of the parties).

[42] La. Civ. Code art. 1943.

[43] *Kellog v. Kellogg*, 36,374 (La. 2 Cir. 2002); 827 So.2d 1178, 1180 (citing La. Civ. Code art. 1943).

undated and unsigned document.  The document was in Microsoft Word format (meaning it could be edited and revised freely) and contained no information particular to the Defendants (or any other party).  If anything, the January 10, 2008 email and draft document simply constituted an invitation by Mezzo (through Kelly) to make an offer (i.e., an invitation to enter into a non-disclosure agreement).

The Defendants made an offer to enter into the non-disclosure agreement. On January 10, 2008, Wood completed all the missing information on the Word document and signed two versions of the same document—one with an electronic signature and one with a hand-signature.  He faxed the hand-signed document to Mezzo on that date and emailed the version with his electronic signature.  At this point, Louisiana law provides that Mezzo had a "reasonable" time to accept the offer.[44]  In addition, to create a binding agreement, Kelly had to communicate Mezzo's acceptance to the Defendants.[45]

Mezzo did not offer any evidence at trial to show that it accepted the Defendants' January 10, 2008 offer, within a reasonable time or otherwise or that Kelly *ever* communicated his alleged acceptance to the Defendants.  Just the opposite, on March 6, 2008, Kelly emailed Wood and, among other things, indicated that the parties relationship had changed, that he had not signed the January 10, 2008 document and that he felt a different type of non-disclosure agreement was required.

---

[44]*See*  La. Civ. Code art. 1931.

[45]*See* La. Civ. Code art. 1935.

There are two important consequences of Kelly's March 6, 2008 email. First, Kelly's email shows that Wood's January 10, 2008 offer had lapsed. Given the facts and circumstances and Kelly's own statements, it is not reasonable to believe that the offer made by Wood on January 10, 2008 was still open or valid. Second, and perhaps more importantly, Kelly's email shows that Mezzo had rejected Wood's January 10, 2008 offer. Kelly said that he had not signed the agreement proposed on that date and that he believed the parties needed to use a different agreement because of a change in circumstances.

The April 2008 exchange of emails and proposed agreements likewise did not create a binding non-disclosure agreement between the parties. Kelly acknowledged at trial that he had not signed, in a "timely manner," the agreement Wood sent to him on January 10, 2008 and that he had sent another agreement on April 17, 2008.

The April 17, 2008 version sent by Kelly, unlike what he sent on January 10, 2008, was completed, signed and dated by Kelly on behalf of Mezzo. Had Wood chosen to accept Mezzo's April 17, 2008 offer, he simply would have needed to sign and return this particular document.

However, Wood did not accept the offer made by Mezzo on April 17, 2008. Instead, because of his own concerns that the parties' relationship had changed and that the Defendants needed additional protections, Wood's response email on that same date (which constituted a counteroffer) proposed that the parties enter into the original non-disclosure agreement he sent on January 10, 2008, along with two additional agreements: another non-disclosure agreement written by Frontline and

a professional services agreement. Wood's email and Mezzo's email were both sent by email on April 17, 2008. It is significant to point out that Wood never signed the agreement sent to him by Mezzo on April 17, 2008. Likewise, Mezzo never signed (or expressed any acceptance) of the Defendants' April 17, 2008 offer to enter into the three separate agreements proposed on that date.

Despite Mezzo's contention that the April 17, 2008 email exchanges created a binding agreement, this cannot be the case. The emails and the attached agreements were materially different from each other. Mezzo proposed a single non-disclosure agreement; the defendants' proposed the parties enter into three different agreements, simultaneously. Neither party accepted the others' offer on that date.

Mezzo introduced into evidence a copy of what purports to be the fully executed version of the non-disclosure agreement that forms the *sole* basis for its breach of contract claims (*See* Exhibit P-7). The Court should find that this document does not constitute a binding agreement for a number of reasons.

First, Mezzo did not introduce any evidence to show when Kelly executed this alleged agreement or when Kelly (or Mezzo) transmitted the alleged acceptance to the Defendants.

Second, while Mezzo alleged in its complaint that the agreement was "executed" on January 10, 2008 and Kelly wrote "January 16, 2008" under his signature, the evidence shows that Kelly signed the document well after that date, after the point at which the offer expired. In fact, Kelly admitted that he "back

signed" the agreement well after that date, attempting to make it appear as though he signed and/or executed it in January 2008.

The evidence established that Kelly signed the agreement in October 2008 or afterwards.[46] By that point, given the circumstances and the relationship between the parties, *i.e.*, that Wood had already paid $5,000 for the allegedly confidential reports and because the parties' relationship had soured, the January 10, 2008 "offer" sent by the Defendants had lapsed and/or had been rejected, and therefore could not be accepted. Alternatively, even if the January 10, 2008 offer could have been accepted, Mezzo never sent a copy of the fully executed agreement to the Defendants which is required by law to create a binding agreement. The evidence

---

[46] This conclusion is based on several pieces of evidence: (a) Wood signed and faxed a copy of the agreement to Mezzo on January 10, 2008; (b) unknown to him, Wood's insurance card was superimposed on the first page of the fax received by Mezzo on January 10, 2008, but not on Exhibit P-7 (the purported agreement) offered by Mezzo; (c) after Wood faxed a signed copy of the agreement to Mezzo on January 10, 2008, he punched holes in the document and put it in a binder; (d) Wood testified that he took the three-whole punched version out of his binder and sent it back to Mezzo in October 2008, in response to a series of threatening letters he received. To that point, he had not sent a copy of the agreement with three-hole punch marks. Like the copy of the non-disclosure agreement Wood sent to Kelly in October, 2008, Exhibit P-7 (1) does not have a first page with Wood's insurance card superimposed on it; and (2) it does have shadows of three hole punch marks. This raises the obvious questions-- if Kelly did not have in his possession an "un-botched" copy of the January 10, 2008 agreement signed by Wood until October, 2008, which the evidence shows, how could he have signed the offer on January 16, 2008? And why does Kelly's signed version of the agreement which Mezzo seeks to enforce have shadows of three hole punches like the non-disclosure agreement that Woods attached to his response and provided to Mezzo for the first time in October, 2008? The answer is simple: Mezzo, acting through Kelly back signed the agreement that Woods attached to his October, 2008 letter, in October 2008 or afterwards.

shows that the first time Wood saw a copy of what purported to be a fully executed copy of the agreement was when he was served with the complaint.

In addition to failing to establish the existence of an agreement, Mezzo likewise failed to show any breach of the agreement. Mezzo asserts that the Defendants received and allegedly disclosed Mezzo confidential information. The evidence establishes, however, that the trade secrets identified by Mezzo were never disclosed to the Defendants. In addition, the concepts of a microtube recuperator, a corrugated shape and a recuperator in an annular shape were not confidential or proprietary concepts belonging to Mezzo. This information was publically available and/or contained in papers published by Kevin Kelly.

Additionally, Mezzo did not establish that it suffered any damages as a result of the Defendants' alleged breach of the confidentiality agreement. At best, Mezzo established a speculative and conclusory damage figure ($250,000) which was not based on any analysis, evidence or expert testimony. Consequently, Mezzo failed to prove any damages related to breach of contract.

### Theft of Trade Secrets

Related to its breach of contract claims, Mezzo alleges that the Defendants stole Mezzo's trade secrets. To make out this claim, Mezzo has the burden of showing a protectable trade secret was misappropriated and that Mezzo suffered damages as a result.[47] Whether a "protectable trade secret exists in fact" is a

---

[47] La. R.S. 51:1431; *Tubos v. Acero de Mexico, S.A. v. American International Corp, Inc.*, 2929 F.3d 579 (5th Cir. 2002)

threshold inquiry.[48] Courts require more than generalized allegations of the existence of a trade secret.[49] The Louisiana Uniform Trade Secrets Act (LUTSA)[50] defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

If a trade secret is found to exist, the Court further considers whether an "express or implied contractual or confidential relationship exists between the parties which

---

[48] *Engineered Mechanical Services, Inc. v. Langlois*, 464 So.2d 329, 333 (La.App. 1 Cir. 1984).

[49] *See Nutrition Mgmt. v. Harborside Healthcare Corp.*, 2004 WL 764809, at *5 (E.D. Pa. Mar. 19, 2004) (summary judgment for defendant where fraud and other claims involved a trade secret accusation, but plaintiff did not identify the trade secret); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 2003 WL 22231544, at *5-6 (D. Minn. Sep. 25, 2003) (summary judgment for defendant where, among other things, plaintiff failed to specifically identify alleged secrets in a network storage appliance); *Mextel, Inc. v. Air-Shields, Inc.*, 2005 WL 226112, at *42 (E.D. Pa. Jan. 31, 2005) (summary judgment for defendant on trade secret claim about a "sensor module" where plaintiff failed to identify what information in documents was allegedly secret); *Bradbury Co. v. Teissier-Ducros*, 413 F. Supp. 2d 1209, 1222-24 (D. Kan. 2006) (granting summary judgment for defendant where plaintiff provided no detail at all on allegedly secret technology and explaining that "Plaintiff has the burden under the KUTSA to define its trade secrets with the precision and particularity necessary to separate it from the general skill and knowledge possessed by others"); *Glynn Interactive, Inc. v. Itelehealth, Inc.*, 2004 WL 439236, at *5 (D. Md. Mar. 9, 2004) (summary judgment for defendant where plaintiff made only exceedingly generic claim that secrets were in "expertise and information provided" and thus failed to identify alleged secrets).

[50] La. R.S. 51:1431, *et seq*.

obligates them not to use or disclose the secret information."[51] A party's failure to take reasonable efforts to maintain the secrecy of a trade secret will result in its loss. For example, the disclosure of a trade secret to persons who have no obligation of confidentiality will end the property right.[52]

The duty to maintain confidentiality is a critical factor for a trade secret claim. This duty may arise out of "an express or implied contractual or confidential relationship."[53] In cases where no express contractual relationship exists, courts have found an implied duty for agents or employees to maintain their principal's employer's trade secrets in confidence even after the agency relationship ends.[54] Conversely, courts have found no implied fiduciary duty between parties contracting at arms-length.[55]

---

[51] *Engineered Mechanical Services, Inc., v. Langlois*, 464 So.2d 329, 334 (La.App. 1 Cir. 1984).

[52] *Tubos de Acero de Mexico, S.A. v. American Intern. Inv. Corp.*, 292 F.3d 471, 483 (5th Cir. 1992)("A disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade secret.")(quoting *Sheets v. Yamaha Motors Corp., USA*, 849 F.2d 179 (5th Cir. 1988)); *McPhearson v. Shell Oil Co.*, 584 So.2d 373 (La.App. 4th Cir. 1991)(developer of a motorized, auger-type shaft to replace gravity driven troughs for conveying oil waste on oil rigs had no trade secret rights because he built and used the shaft in public view).

[53] *Engineered Mechanical Services, Inc.*, 464 So. 2d at 334.

[54] *Id* (former employee who did not sign a confidentiality agreement was nevertheless in a confidential relationship with employer by virtue of his employment and was prohibited from utilizing trade secret information after termination).

[55] *See Omnitech International, Inc. v. Clorox Co.*, 11 F.3d 1316, 1330 (5th Cir. 1994)(limiting duties of confidentiality to the terms of a written non-disclosure agreement).

Thus, given the emphasis on taking steps to keep the alleged trade secrets confidential and the requirement of a written agreement for an "arms" length relationship like the one here, the question of the enforceability (or not) of the alleged non-disclosure agreement is critical to the trade secret claims asserted by Mezzo. For the reasons set out above, Mezzo has not established the existence of a confidentiality agreement between the parties, undermining a basic element of Mezzo's trade secret claim—the existence of an obligation to maintain the confidentiality of alleged trade secrets.

Mezzo's trade secret claims fail for other reason as well.

First, the evidence establishes, that the trade secrets identified by Mezzo in response to discovery requests and confirmed at trial, were not actually disclosed to the Defendants. In addition, the concepts of a microtube recuperator, a corrugated shape and a recuperator in an annular shape, other concepts that Mezzo asserted as trade secrets, were not confidential or proprietary concepts belong to Mezzo, as they were publicly available and contained in papers published by Kevin Kelly.

Second, Mezzo failed to offer any evidence to establish that the alleged trade secrets had "independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use…." This showing is required under Louisiana's trade secret act, and Mezzo failed to put on any evidence in this regard.

Third, Mezzo failed to establish any evidence of damages that it suffered as a result of the alleged misappropriation of its trade secrets by the Defendants.

Fourth, the evidence establishes that the Defendants paid $5,000 to Mezzo. In exchange for this payment, as acknowledged in Kelly's testimony and correspondence, the Defendants were entitled to and in fact, did, use the drawings contained in the 2008 February Design Report and April 2008 Quotation. Because the Defendants paid for those reports, the contents of those reports cannot constitute trade secrets of Mezzo.

### *Fraud*

Louisiana Civil Code Article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."

Mezzo did not meet its burden to show that the Defendants committed fraud or that any damages were sustained by Mezzo as a result of the alleged fraud. In fact, Mezzo's own allegations are inconsistent and show that they have not alleged a proper basis for fraud.[56]

### *Negligent Misrepresentation*

The elements of negligent misrepresentation are: (1) supplying false information (2) to a person to whom a legal duty to supply correct information exists, (3) a breach of that duty by affirmative misrepresentation or omission, and

---

[56] Mezzo says the "fraud" at issue is that the Defendants represented that they had entered into a confidentiality agreement, when in fact, there was no

(4) such person suffering damages (5) due to his justifiable reliance on the affirmative misrepresentation or omission.[57]

Mezzo did not establish that any of the elements of a negligent misrepresentation claim or that Mezzo suffered any damages as a result of those alleged misrepresentations.

### *Tortious interference with existing contracts*

In Louisiana, the elements of tortious interference with a contract are: (1) a contract with an entity (2) about which an officer of the entity has knowledge, (3) the officer causing the entity to breach the contract or burden the entity's contractual performance, (4) without justification, (5) and damages caused by the breach.[58]  A plaintiff must establish each of these elements to recover.

This claim is asserted again Wood, individually.  Mezzo offered no evidence to show that Wood actually did (or could) have caused Frontline Aerospace to breach the alleged non-disclosure agreement, which, as established by the Defendants, did not exist.  Moreover, Mezzo did not prove any damages as a result of the Defendants' alleged conduct.

---

agreement.    (299:21-25, 300: 1) At the same time, Mezzo contends that an agreement exists between the parties.  Mezzo cannot have it both ways.

[57] *Hardy v. Hartford Ins. Co*., 236 F.3d 287, 292 (5th Cir. 2001).

[58] *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La. 1989); *Neel v. Citrus Lands of La.*, 629 So.2d 1299, 1301 (La. App. 4 Cir. 1993).

### *Civil conspiracy*

Under Louisiana law, the elements of civil conspiracy are: (1) an agreement existed between two or more people to commit an illegal or tortious act, (2) the act was committed (3) resulting in damages, and (4) there was an agreement as to the intended outcome or result.[59]

Mezzo offered no evidence to show that any of the elements of this claim were met or that Mezzo suffered damages as a result of the alleged conspiracy.

### *Unjust enrichment*

Article 2298 of the Louisiana Civil Code states that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person," unless (1) "the enrichment results from a valid juridical act" or (2) another remedy is available at law. In its complaint Mezzo alleges that Wood "enjoyed the benefits of Mezzo's confidential information without incurring the costs to develop the information."

Mezzo offered no evidence to show that any of the elements of this claim were met or that Mezzo suffered damages as a result of the Defendants' conduct. Furthermore, the evidence shows that Wood paid $5,000 for the information he received and was entitled to use. Additionally, Mezzo did not establish that Wood received any of the alleged trade secrets that Mezzo contends enriched the Defendants.

---

[59] *Butz v. Lunch*, 97-2166 (La. App. 1 Cir. 4/8/98); 710 So.2d 1171, 1174.

### *Defendants' Claim for Unfair Trade Practices*

The Louisiana Unfair Trade and Consumer Protection Act ("LUTPA"), La. R.S. 51:1401, *et seq*., expansively states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."[60]

The LUTPA creates a private cause of action for any consumer or business competitor "who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful [under the LUTPA]."[61] Damages recoverable under the LUTPA include any actual damages.[62] When damages are awarded under the LUTPA, "the court shall award to the person bringing such action reasonable attorney fees and costs."[63]

The purpose of the LUTPA is to deter injury to competition.[64] Louisiana courts have acknowledged that deciding what actions violate the LUTPA must be determined on a case-by-case basis because "the definition of what may constitute

---

[60] La. R.S. 51:1405.

[61] La. R.S. 51:1409.

[62] *Vercher v. Ford Motor Co*., 527 So.2d 995, 1000 (La. App. 3 Cir., 1988).

[63] La. R.S. 51:1409.

[64] *Landreneau v. Fleet Financial Group*, 197 F.Supp.2d 551, 557 (M.D. La., 2002).

an unfair act or practice is broad and subjective."[65] A trade practice is unfair "when it offends established policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers [or] business competitors."[66] Facially lawful activities may nevertheless form the basis for a LUTPA claim when they are performed for the "unfair" purpose of harming one's competitor.[67] For example, intentional harassment through judicial process has been found to constitute an unfair trade practice under the LUTPA.[68]

Mezzo's conduct amounted to an unfair trade practice which caused the Defendants to suffer damage. The evidence shows that Mezzo did not sign the alleged non-disclosure agreement, as represented to the Defendants and the Court, on January 10, 2008 or January 16, 2008. Instead, it signed the document (alleged to be a binding agreement) at some point after October 2008, and perhaps as late as the date it filed suit on January 10, 2010.

---

[65] *See, e.g., Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 548 (La. App. 1 Cir., 1984).

[66] *Shaw Industries, Inc. v. Brett*, 884 F.Supp. 1054, 1056 (M.D. La., 1994) (citing *Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 548 (La. App. 1 Cir., 1984)).

[67] *See Monroe Medical Clinic, Inc. v. Hospital Corp. of America*, 622 So.2d 760, 767 (La. App. 2 Cir., 1993) (noting a distinction under LUTPA "between an innocent purpose and an 'unfair' purpose motivating conduct which is facially otherwise lawful"); *Marshall v. Citicorp Mortg. Inc.*, 601 So.2d 669, 671 (La.App. 5 Cir., 1992) ("[A] legal practice may be an unfair trade practice, depending on the facts and circumstances of the particular case.").

[68] *Bank of New Orleans and Trust Co. v. Phillips*, 415 So.2d 973, 975 (La. App. 4 Cir., 1982) (plaintiff's "intentional and knowledgeable filing of suit in the wrong venue is tantamount to an abuse of process" that "acts as a harassment to the defendant" and constitutes an unfair trade practice under La. R.S. 51:1401).

Yet, Mezzo attempted to enforce the agreement in an effort to intimidate the Defendants and protect Mezzo's position vis-à-vis Triumph, with whom Mezzo had entered an exclusive licensing agreement. Kelly's own testimony shows why Mezzo attempted to enforce an unenforceable agreement, thus committing an unfair trade practice: Mezzo had provided an exclusive license to Triumph for the very technology claimed in the '031 Patent and Mezzo risked being sued by Triumph. Mezzo needed to create a cause of action to protect itself against Triumph.[69]

The Louisiana statute permits the Court to decide what conduct meets the standard for "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers [or] business competitors."[70] The evidence here clearly shows that Mezzo's conduct satisfies this standard. Likewise, the Defendants have established that Mezzo's conduct has caused damage, causing Frontline to divert resources and hampering Frontline's ability to raise capital consistent with its business plan.

---

[69] The Court ordered Mezzo to provide all Triumph documents relating to the '031 Patent. Because Mezzo failed to comply with the Court's order (as established through Kelly's testimony), Mezzo is contempt of this Court. Among available sanctions, the Court may apply a negative evidentiary presumption and conclude that the documents not produced by Mezzo (including the email sent on the morning of Kelly's deposition) are damaging to Mezzo's claims.

[70] *Shaw Industries, Inc. v. Brett*, 884 F.Supp. 1054, 1056 (M.D. La., 1994) (citing *Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 548 (La. App. 1 Cir., 1984)).

## *Defendants' Request for Attorney's fees*

In their answer and counterclaim, the Defendants requested attorney's fees. The Court may award attorney's fees, based on two separate and independent grounds. Both grounds are satisfied in this case.

First, if the Court awards LUTPA damages to the Defendants, then the Court "shall" also award reasonable attorney fees and costs.[71]  The threshold question here is whether or not the Defendants have sustained damages.  The unchallenged testimony of Wood establishes that Frontline is a startup business with no cash flow other than the influx of cash provided by investors.  Wood has invested significant money of his own in Frontline (estimated at well over $400,000) and is constantly seeking investment others.

Ever since Mezzo decided to exclusively license its technology to Triumph in 2008, the evidence shows that Mezzo has sought to intimidate and discredit the efforts of Frontline and Wood, culminating with the filing this unfounded lawsuit, and presenting no credible evidence to support its case.  Wood testified that he believed that this campaign by Mezzo has cost him investment dollars, but he could not quantify the amount.  However, it is reasonable that the constant and public effort by Mezzo to crush a possible new competitor, Frontline, damaged Frontline at least nominally.  Nominal damages being present, the Court must award the Defendants their attorney's fees under LUPTA.

---

[71] La. R.S. 51:1409.

Second, Mezzo is not an inventor under §256. The Defendants may be entitled to attorney's fees for defending against Mezzo's patent claims under 35 U.S.C. § 285.[72] Section 285 of the Patent Act states in its entirety: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

The Federal Circuit has explained that the determination of whether a case is exceptional is a two-step process. First, the Court must determine whether the case is exceptional. Second, if the case is exceptional, the Court should then decide whether attorney fees should be awarded.[73]

Evidence of an exceptional case must be clear and convincing.[74] A case is more likely to be exceptional when there has been litigation misconduct or vexatious, frivolous, or otherwise bad faith litigation.[75] A case may also be found exceptional when a party's "total lack of evidence" leads to its "woeful failure" to carry its burden of persuasion.[76] The Federal Circuit has affirmed awards of

---

[72] In patent cases, a party need only request attorney's fees in its pleadings to invoke § 285. *See Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 n.3 (Fed. Cir., 2005).

[73] *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1461 (Fed. Cir. 1998) (*en banc*).

[74] *Qualcomm Incorporated v. Broadcom Corp.*, 548 F.3d 1004, 1010 (Fed. Cir. 2008).

[75] *Brasseler v. Stryker Sales*, 267 F.3d 1370, 1380 (Fed. Cir., 2001).

[76] *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 807-08 (Fed. Cir. 1990).

attorney's fees under § 285 against parties who falsified evidence[77] or pursued baseless claims.[78]

When a party knew, or, after a reasonable investigation, should have known that its claim was baseless, an action to assert the claim is frivolous.[79] Inventorship disputes under § 256 have been qualified as exceptional.[80]

Since the '031 Patent had not yet issued at the time Mezzo filed its complaint, it sought a judgment declaring that Mezzo is the sole inventor of U.S. Application No. 12/116,536. Mezzo never amended its complaint to name the '031 Patent. The plain language of § 256 limits its application to "issued patents"; there is no private cause of action under § 256 to correct the inventorship of a U.S. patent application.[81]

Mezzo, after a reasonable investigation, should have known that its claim to be named an inventor of a U.S. Patent application was baseless because (1), as discussed above, a juridical person lacks the legal capacity to be named an inventor

---

[77] *Aptix Corp. v. Quickturn Design Sys., Inc.,* 269 F.3d 1369, 1375 (Fed.Cir.2001).

[78] *Eltech Sys. Corp. v. PPG Indus., Inc.,* 903 F.2d 805, 810-11 (Fed.Cir.1990).

[79] *Haynes Intern., Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993).

[80] *See Falana v. Kent State University*, 2010 WL 5178838 (N.D. Oh. Dec. 15, 2010), *issue not reached on appeal because not part of final judgment* , __ F.3d __, 2012 WL 171550 (Fed. Cir. Jan. 23, 2012).

[81] See *Eli Lilly and Co. v. Aradigm Corp*., 376 F.3d 1352, 1356 n.1 (Fed. Cir., 2004)

and (2) the applicable statute - and the unambiguous Federal Circuit case law interpreting it - clearly does not apply to a pending, unissued patent application. Mezzo failed to join the alleged true inventors. Mezzo failed to do its homework and brought a frivolous claim, making this case is exceptional.

Mezzo's failure to meet its evidentiary burden under § 256 also justifies a finding that this case is exceptional. Construction of a patent's claims is the first step in *any* inventorship analysis. In order for Mezzo to have proved its alleged inventorship, it needed to present proof of its inventorship of each and every element of each and every claim.

Mezzo made no effort to provide any evidence or analysis to show any of the required elements for inventorship. Thus, the Court should find that the case is exceptional.

The facts of this case justify the award of attorney's fees to the Defendants after a hearing on the issue to allow the Court to consider the amount of reasonable attorney's fees.[82]

---

[82] *See Takeda Chemical Ind. v. Mylan Laboratories*, 549 F.3d 1381, 1390 (Fed. Cir., 2008).

Respectfully submitted,

*s/Ryan E. Johnson*

_____

Robert C. Tucker (La. Bar Roll No. 2152)
Ryan E. Johnson (La. Bar Roll No. 26352), T.A.
David P. Borghardt (La. Bar Roll No. 32351)
Jones, Walker, Waechter, Poitevent,
  Carrere & Denègre L.L.P.
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, LA 70809-7000
Telephone: (225) 248-2000
Facsimile: (225) 248-3080

*Attorneys for Defendants, Frontline Aerospace, Inc. and Ryan Wood*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of February, 2012, a true and correct copy of the foregoing pleading was electronically filed through the Court's EM/ECF system. A copy of this pleading will be served on opposing counsel via that system.

Baton Rouge, Louisiana

*s/Ryan E. Johnson*

_____

Ryan E. Johnson